IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

|  |  |
|---|---|
| | No. 14 - CR- 00 **123** |
| **UNITED STATES OF AMERICA,** | **Count 1**<br>18 U.S.C. § 1425(a)<br>Unlawfully Procuring or<br>Attempting to Procure<br>Naturalization or Citizenship |
| Plaintiff, | |
| vs. | **Count 2**<br>18 U.S.C. § 1425(b)<br>Procuring or Attempting to<br>Procure Citizenship to Which<br>A person is not Entitled |
| **GERVAIS (KEN) NGOMBWA,** | |
| Defendant. | 8 U.S.C. § 1451(e)<br>Revocation of Citizenship |
| | **Count 3**<br>18 U.S.C. §§ 371, 1425(a)<br>Conspiracy to Unlawfully<br>Procure or Attempt to Procure<br>Citizenship |

PRESENTED IN OPEN COURT
BY THE
FOREMAN OF THE GRAND JURY
And filed 10/30/14
ROBERT L. PHELPS, CLERK

**Count 4**
18 U.S.C. § 1001(a)(2)
Making a Materially False
Statement

## INDICTMENT

The Grand Jury charges:

### Background

### Rwanda and the Rwandan Genocide: April to July 1994

1.  Rwanda is one of the smallest countries in Africa.  In 1994, with a population

of nearly 8 million people, Rwanda's population density was among the highest on

1

the African continent. The two main ethnic groups in Rwanda were the Hutu and the Tutsi. The Hutu accounted for approximately 90 percent of the population. Just prior to Rwanda's independence from Belgium in 1962, the Hutu majority gained control of the government and engaged in discrimination and acts of violence against the Tutsi. As a result, numerous Tutsi fled Rwanda. Some formed a rebel guerilla army, known as the Rwandan Patriotic Front ("RPF"), in neighboring Uganda.

2. In about October 1990, the RPF invaded Rwanda. In response, Rwandan President Juvenal Habyarimana (a Hutu) sanctioned attacks on Tutsi civilians and promoted virulent anti-Tutsi propaganda. The civil war ended in August 1993 with the signing in Tanzania of a peace agreement known as the Arusha Accords that mandated Hutu and Tutsi power-sharing in a transitional government.

3. Pursuant to the Arusha Accords, Habyarimana's Hutu party, the Mouvement Republicain National Pour la Democratie et le Developpement (MRND), would share power with several other opposition political parties, including the Tutsi RPF, and another Hutu party, the Mouvement Democratique Republicain (MDR). As part of the agreement, each of the political parties was to be allocated specific positions within the transitional government. Faustin Twagiramungu, a member of MDR, was to become Prime Minister; however, the transitional government stipulated by the Arusha Accords was not established.

4. In October 1993, ethnic tensions in Rwanda were significantly heightened upon the assassination of the first popularly-elected Hutu president in neighboring

2

Burundi by Tutsi army officers. In the days after the assassination, Hutu attacked Tutsi in many parts of Rwanda, and Hutu extremists rallied against power-sharing.

5.      In early April 1994, Rwandan President Habyarimana attended a summit in Tanzania at which the heads of state of neighboring governments convinced him to accept the terms of the Arusha Accords.

6.      On or about April 6, 1994, while returning from the meeting in Tanzania, the plane carrying Rwandan President Habyarimana and Burundi's President, was shot down by ground-fired missiles as it approached the airport at Kigali, Rwanda's capital. Habyarimana's assassination precipitated a period of intense violence throughout Rwanda.

7.      Within hours of the assassinations, Hutu extremists formed an interim government and began killing prominent individuals, including moderate Hutu politicians and Tutsi leaders. Those killed included the current prime minister, Agathe Uwilingiyimana, and other government officials opposed to the extremists.

8.      Working in cooperation with the interim government and the military, members of the Interahamwe, the youth militia of the MRND and other Hutu militia groups began to set up roadblocks around the country. These roadblocks became a principal means for the massive killing campaign that became known as the Rwandan genocide. As the genocide intensified, Hutu militia members, local administrators, and civilians armed with machetes, guns and grenades, killed Tutsi civilians and the Hutu who tried to protect them at roadblocks, in public squares,

homes, and hiding places, such as schools, hospitals and places of worship where the victims had sought shelter.

9. The genocide ended in July 1994 only after the invading RPF managed to defeat the Rwandan military and halt the killings. By that time, an estimated 500,000 - 800,000 persons, nearly one tenth of the population of Rwanda, had been killed.

10. After taking control of the country, on about July 19, 1994, the RPF installed an "Enlarged Transitional Government" which was partially derived from the cabinet stipulated in the Arusha Accords. The various political parties kept the positions outlined by the Accords, with two exceptions. First, the RPF gave itself control of all of the ministries that should have gone to the MRND and, second, a new post of Vice-President was created and given to RPF General Paul Kagame. Pasteur Bizimungu was named President and Faustin Twagiramungu was named Prime Minister of Rwanda.

## Faustin Twagiramungu

11. Faustin Twagiramungu was born in 1945 in Rwanda. He had four brothers and one sister, none of whom are alive today. Twagiramungu's wife is the daughter of the first president of Rwanda. Twagiramungu has been politically active in Rwanda and was the president of the MDR. However, Twagriamungu was never a member of the Habyarimana government.

12. In 1993, the MDR split as a result of the convening of the "Extraordinary National Congress," which Twagiramungu was not allowed to attend. That split in

4

the party resulted in the formation of a new party, "MDR-Power," aligned with the Hutu extremists. The original MDR party aligned with those supporting the Arusha Accords. Twagiramungu continued to serve as the leader of MDR.

13.    MDR-Power participated in the genocide, with many party members taking an equally active role in both, the party and the Interahamwe youth militia. Defendant, Gervais (Ken) Ngombwa, (hereafter "defendant"), was reportedly a leader of the MDR-Power faction in Nyamata, Rwanda.

14.    When the killings began in 1994, Twagiramungu was protected for several days by United Nations forces, before being evacuated from Rwanda and eventually settling in Belgium. Twagiramungu returned to Rwanda at the end of the genocide in July 1994 and assumed the position of Prime Minister. Twagiramungu remained Prime Minister until resigning that position at the end of August 1995. Twagiramungu has lived in exile in Belgium since 1995. Twagiramungu is not related to defendant.

### The UNHCR and the JVA

At all times material to this Indictment:

15.    Following the end of the genocidal killings in Rwanda, the United Nations High Commissioner for Refugees (UNHCR) assisted the United States State Department (the State Department) in screening potential applicants for refugee status. Given there were tens of thousands of potential applicants for admission to the United States as refugees, yet only a limited number could be approved due to limitations on the number of refugees the United States would accept in a given

5

year, it was necessary to prioritize the applicants to determine those who had the greatest need for relocation out of the region.

16.     Although the UNHCR assisted in the collection of relevant information required by the United States, the ultimate decision of whether to accept a refugee applicant for admission to the United States was made by the Immigration and Naturalization Service (INS) (now, the Department of Homeland Security), working in concert with the State Department.

17.     In order to be admitted to the United States as a refugee from Rwanda  in 1998, applicants were required to establish that they had either suffered persecution in the past and/or had a well-founded fear of being persecuted in the future on account of one of five grounds: race, religion, nationality, political opinion, or membership in a particular social group.  Further, a person could not then, and cannot now, be considered for admission as a refugee if the person ordered, incited, assisted, or otherwise participated in the persecution of others on account of one of the five grounds.  A spouse or child of a principal refugee applicant who was found to have qualified for admission to the United States was also entitled to be admitted with the applicant as a derivative.

18.     Once an applicant established eligibility for the refugee program, immigration officers sought to determine whether any possible grounds existed which would prohibit the applicant's admission to the United States.  Refugee applicants were required to show that no grounds of inadmissibility under section 212(a) of the Immigration and Nationality Act applied to them.  Under Section

212(a), several classes of aliens were "ineligible to receive visas and ineligible to be admitted to the United States." Those included any alien who: 1) by fraud or willfully misrepresenting a material fact, seeks to procure a visa or other documentation, or admission into the United States; 2) admits having committed or who admits committing acts which constitute the essential elements of a crime involving moral turpitude[1]; or 3) who ordered, incited, assisted or otherwise participated in genocide as defined for purposes of the International Convention on the Prevention and Punishment of Genocide.

19.    As part of the process to identify appropriate candidates for relocation to the United States as refugees from Rwanda, in about 1998, the UNHCR identified families who were living in the Mkugwa Refugee Camp near Kibondo, Tanzania, as potentially eligible for relocation because the families involved "mixed" marriages. In other words, one spouse was Tutsi and the other was Hutu. The families were considered potentially vulnerable to future persecution due to their mixed composition.

20.    During 1998, UNHCR workers and other non-governmental organizations conducted interviews of individuals and accompanying family members who had been identified as prospective refugees, in an effort to gather their biographical and case history information. The information provided in the course of these interviews was documented in a variety of ways, including in typewritten reports or on a "US Refugee Resettlement Registration and Referral Form." If the applicant

---

[1]   Among others, crimes involving fraud, making false statements, and genocide are considered "crimes involving moral turpitude."

7

was part of the Joint Voluntary Agency/Kenya (JVA) program, information was documented on a JVA "Kenya Form I: Bio Information," "Kenya Form II: Additional Resettlement Information," "Kenya Form III: Family Tree For Each Member of the Case," and "Refugee Case History Form."

21.    The JVA was part of the United States Refugee Resettlement Program (the "Resettlement Program") that dealt with prospective Rwandan refugees who had fled to, and were then living in, Kenya.

22.    The information collected by the UNHCR, or otherwise as part of the Resettlement Program, was provided to United States immigration officers to assist them in determining whether an applicant for refugee status was eligible to be admitted to the United States. In making this determination, the immigration officers relied upon the information they received as being accurate.

23.    After examining the information gathered in the initial interviews, an immigration officer would interview the refugee applicant and record the refugee's responses, and the officer's findings, on the "Rwandan Questionnaire for Visa Applicants" (the "Rwandan Questionnaire") and on the "United States Immigration and Naturalization Service (INS) Refugee Application Worksheet" (the "Application Worksheet").

24.    In addition to asking the standard refugee application questions, immigration officers who interviewed Rwandans applying to enter the United States as refugees in 1998, also asked the applicants to respond to the Rwandan Questionnaire. Family members about 16 years old or older, accompanying the

principal applicant and seeking admission on the basis of the principal applicant's claim, were also required to respond to the questions on the Rwandan Questionnaire. The Rwandan Questionnaire asked questions that were specific to the events which occurred in Rwanda. The purpose of this questionnaire was two-fold: first, to assist the INS in assessing whether an applicant could be considered for admission into the United States, as a refugee; and second, to assist the INS in determining whether there were other grounds to bar admission of the applicant to the United States. Immigration officers also considered whether the answers given by each family member were credible and consistent with the answers given by other members of the family.

25. The Application Worksheet was used by the INS to summarize the interviews conducted by the immigration officer. The immigration officer also recorded on this form the officer's findings and recommended decision concerning approval or denial of the refugee claim.

26. If the immigration officer recommended approval of the refugee claim, the applicant was notified that the application for refugee status had been conditionally approved. Final approval of the application was contingent upon the applicant and any accompanying family members "completing a medical examination by a U.S. approved panel physician, completion of security clearance procedures, and receipt of sponsorship assurance from a voluntary resettlement agency in the United States."

9

27.     Upon satisfactory completion of the contingencies, the refugee and each
respective family member would be given visa clearance; flown to the United States;
and permitted entry as a refugee.

28.     After being lawfully present in the United States for one year, a refugee could
seek adjustment of status to that of a permanent resident alien.  Lawful admission
to the United States was a prerequisite to adjusting to permanent resident status.

29.     An alien who had adjusted status to that of a permanent resident alien, and
had resided continuously thereafter in the United States for a period of five years,
could then apply to become a naturalized citizen of the United States.  Achieving
status as a permanent resident alien was one of the prerequisites to becoming a
naturalized United States citizen.

### Gervais (Ken) Ngombwa

30.     Defendant, Gervais (Ken) Ngombwa, was born in Kigali, Rwanda in about
1960.  Defendant is a Hutu.  Defendant's parents are deceased.  In 1994, defendant
resided in Nyamata with Antoinette Mukakabanda and several children.
Defendant had a prior relationship with Alivera Nyramacumbia, and had children
with Nyramacumbia as a product of that relationship.  Defendant has or had
several siblings.  These included Jean Damascene Rwabidadi and Jean
Nepomescene Ndemezo; who had each been employees of the military in Rwanda.
Rwabidadi is currently imprisoned in Rwanda.  Defendant is not related to Faustine
Twagiramungu, Aaron Bizumwami, or Felician Masumbuko. Defendant was

10

convicted in 2007 in the gacaca courts in Rwanda of committing genocide and inciting others to commit genocide.

31.    Defendant, Mukakabanda, and several children (Faustine Ngayaberura, Gilbert Mugarula, Juvenary Hakizimana, Josiane Uwera, Louise Usanase, Grevais Murwanashyaka, and Antoinette Uwanagombwa), fled Rwanda in the midst of the genocide in 1994. The group eventually traveled to, and resided in, the Mkugwa, refugee camp, where defendant applied for refugee status to gain entry to the United States. Mukakabanda and the children applied as accompanying family members of defendant.

### Antoinette Mukakabanda

32.    Antoinette Mukakabanda, was born in Kigali, Rwanda, on about January 4, 1961. Mukakabanda is a Tutsi. Mukakabanda's father is deceased, and her mother, Maria Karugwiza, currently resides in Rwanda. Mukakabanda has several siblings who currently reside in Rwanda, including her sisters: Eugenia Mukanyarwaya; Jaqueline Mukanoheli; Anita Nyinawabaganzu; and a brother, Rene Twayagira. Mukakabanda had at least one son, Emabre Kabanda, and one daughter, Josiane Uwera, when she was single. Kabanda died in early 2014.

### Defendant's Initial Refugee Resettlement Interview

33.    On March 11, 1998, defendant was interviewed by a UNHCR resettlement consultant at the Mkugwa, Tanzania, refugee camp near Kibondo, Tanzania, as part of the refugee resettlement process. Defendant was designated as the "PA" ("principal applicant"), meaning that if he was admitted to the United States, his

11

spouse and children would also be entitled to the same admission status. Defendant's responses were documented on the "US Refugee Resettlement Registration and Referral Form," and in a typewritten summary of the interview.

## US Refugee Resettlement Registration and Referral Form

34.     Defendant claimed he was a member of the MDR. Defendant claimed to be married to Antoinette Mukabanda and to have seven children. On the portion of the form asking to identify "all immediate biological and legal relatives, including any step and half relationships for parents, spouses, children, and siblings for each member of the case," defendant falsely claimed Twagiramungu was his only sibling, and identified two "sisters" of his wife and two "brothers" of his wife, including "Emmable Kabanda." No other relatives were identified.

## Refugee Resettlement Interview

35.     Defendant falsely advised in the interview that he had been specifically targeted after the assassination of President Habyarimana because of family political connections, specifically, his brother, Faustine Twagiramungu's relationship to President Habyarimana and his men. According to defendant, Twagiramungu had been president of the MDR since 1991, and supported the RPF, a mainly Tutsi party, from Uganda. As a result of his support of the RPF, many Hutu accused Twagiramungu of collaborating with the Tutsi. Defendant claimed he, as Twagiramungu's brother, was accused of supporting the Tutsi and was further suspected due to being married to a Tutsi. As suspected collaborators, they were viewed as being pro-Tutsi and thus, against their fellow Hutu. Defendant

claimed Twagiramungu was forced to quickly flee in the aftermath of Habyarimana's death, after hearing that the presidential guard planned to kill him.

36. Defendant stated that President Habyarimana's plane crashed on April 6, 1994, and thereafter, at the direction of government radio, he stayed home with his family until April 9 or 10, 1994, when he heard shooting close to his home and people trying to open his gate. That night, defendant and his family fled on foot, until reaching Burundi. Defendant claimed that while he and his family were fleeing to Burundi, his mother and brother were killed by the Interahamwe due to his family's alleged collaboration with Tutsis. Defendant claimed he and his family fled to Zaire about a week after reaching Burundi. Defendant and his family later fled to Tanzania.

### The Refugee Application

37. On about July 03, 1998, at the Mkugwa refugee camp, the defendant signed an INS Form I-590, "Registration for Classification as a Refugee," and a Form G-325A, Biographic Information, attesting to the truthfulness of the above information.

### JVA/Kenya Case History Interview and Forms

#### JVA Case History Form

38. On July 7, 1998, defendant was interviewed as part of the JVA/Kenya Resettlement Program. Defendant's responses were documented on a "Refugee Case History Form" (the "Case History") and on other JVA/Kenya forms. Defendant falsely advised he had seven children in Kigali with his wife Antoinette. Defendant falsely advised he had an older brother who was imprisoned due to being suspected

13

of being an RPF agent. Defendant falsely advised that the brother who was imprisoned had a high government position. Defendant stated the government knew he was in a mixed marriage. Defendant stated he heard gunfire at his door six days after the president was assassinated and fled into the bush. Defendant falsely claimed his siblings were all killed in Rwanda in 1994. Defendant claimed he was confronted by Hutu in the Mkugwa refugee camp in March 1998. Defendant claimed the Hutu threw stones at his residence. Defendant claims he reported this to the UNHCR and government representatives in Tanzania. Defendant claims that, thereafter, he and his family were evacuated to Kibondo, Tanzania, then Kigoma, before being moved back to Mkugwa for resettlement. Defendant claimed he and his family lived in fear that anything could happen to them at any time.

JVA/Kenya Forms I, II, III

39.     On the JVA/Kenya Form I, defendant falsely claimed Felician Masumbuko, another refugee applicant, was a distant relative. Defendant also falsely claimed he and Antoinette Mukakabanda had seven children together, including Juvenary Hakizimana.

40.     On the JVA/Kenya Form II, defendant falsely claimed Aron Bizumwami was the husband of a maternal aunt.

41.     On the JVA/Kenya Form III, defendant falsely claimed Twagiramungu was the oldest son of defendant's parents, and that defendant had five other brothers and one sister of the same parents. Defendant claimed Twagiramungu was in Belgium as of 1995 and falsely claimed defendant's remaining siblings, including his brothers Jean Pomesceni Ndemezo (Demezo) and Jean Damacense (Demasine)

14

Rwabidadi (Gwabitati) were all killed in 1994. Defendant falsely claimed he had only been married once (including "legal, traditional, common-law, or other "unions" that produced children"). Defendant falsely claimed Mukakabanda's parents were both deceased. Further, defendant claimed Mukakabanda had five brothers and three sisters from the same parents, including a false claim that Mukakbanda had a brother named Aimable Kabanda. Defendant falsely claimed Mukakabanda's sisters Eugenie Mukanyarwaya and Jacquleine Mukanoheli were killed in 1994.

## INS Interview and Forms

42.     On July 20, 1998, defendant was interviewed by the INS, Nairobi, Kenya Officer-in-Charge. Defendant's responses were documented on the "Rwandan Questionnaire for Visa Applicants;" "United States Immigration and Naturalization Service (INS) Refugee Application Worksheet;" on the INS Form I-590, captioned "Registration for Classification as Refugee;" and on the INS Form G-646, captioned "Sworn Statement of Refugee Applying for Entry into the United States." On the same date, Antoinette Mukakabanda, Faustine Ngayaberura, Gilbert Mugarula, and Juvenary Hakizima were also interviewed and gave response to the questions on the Rwandan Questionnaire for Visa Applicants.

Rwandan Questionnaire for Visa Applicants

43.     In responding to the questions on the "Rwandan Questionnaire for Visa Applicants," defendant claimed he had to flee Rwanda on April 12, 1994. Defendant falsely denied being involved in killing or injuring any person after April 1, 1994, or encouraging others to participate in such killing or injury. Defendant falsely claimed his brother Faustine Twagiramungu was Prime Minister of the new Tutsi

15

formed government between July 1994 and October 1995. Defendant also falsely claimed his brother Twagiramungu had been the Foreign Affairs Minister under the Habyarimana government. When asked whether any of his immediate family members had been employees of the government, of the military, or of any political party of Rwanda, defendant falsely claimed only his brother Twagiramungu had been so employed.

44.    Faustine Ngayaberura, Gilbert Mugarula, and Juvenary Hakizima each falsely claimed their uncle had been the Prime Minister between July 1994 and October 1995.

INS Refugee Application Worksheet

45.    When interviewed by Officer-in-Charge, as documented on the attachment to the Refugee Application Worksheet, defendant falsely claimed he and his wife were arrested in 1990 and they, along with his mother-in-law, were beaten by the government forces. Defendant falsely claimed he was taken to his home, and both his home and his mother-in-law's home were searched. Defendant claimed that those who arrested him and his wife tried to trick them into confessing that they were helping the RPF. Defendant claimed that, prior to 1994, the Interahamwe killed his mother's relatives. Defendant falsely claimed his brother helped form a moderate political party and wanted peace and reconciliation between the parties. Defendant claimed that before the President was assassinated in 1994, the government had already declared it intended to kill all Tutsis and allies. Defendant falsely claimed his brother became the Prime Minister of the new Tutsi government but resigned and fled to Belgium because of differences of opinion with the RPF and

16

concerns over "disappearances." Defendant falsely claimed his brother had been the Prime Minister in the RPF government, and the Minister of Foreign Affairs in the Habyarimana government. Defendant falsely claimed no other family had been employed by the government. Defendant claimed he had been willing to return to Rwanda before his brother fled, but after his brother fled, two members of his brother's family had been killed. Defendant also falsely claimed his entire wife's family had been killed prior to 1994. Finally, defendant claimed he had recent trouble in the refugee camp and there were problems with being able to provide him protection.

INS Form I-590

46. On about July 20, 1998, at the Mkugwa refugee camp, while being interviewed by the INS, Nairobi, Kenya Officer-in-Charge, defendant again signed the Form I-590, attesting to the truthfulness of the information on the previously completed form, including corrections noted by the interviewing official, after being sworn to tell the truth by the interviewing official. As noted in the Form I-590, defendant claimed the seven children accompanying him and his wife were his only children, and that he had never previously been married. When defendant completed the Form I-590 on July 3, 1998, he falsely denied having ever been a member of any "political, professional, or social organizations." However, when defendant was interviewed on July 20, 1998, defendant admitted he had been a member of the MDR between 1992 and 1994, but had not been a member of any other political party. The reasons defendant gave for seeking refugee status were noted as being contained in the "Case History."

17

47. On July 20, 1998, defendant signed an INS Form G-646 attesting that he was admissible to the United States and did not fall within any of several classes of aliens who were not admissible to the United States. Defendant subscribed and swore to the information on the form in the presence of a United States government official. Specifically, defendant falsely indicated he was not an alien who: had committed or been convicted of a crime "involving moral turpitude;" had been involved in assisting other aliens to enter the United States in violation of law; procured or attempted to procure a visa by fraud or misrepresentation; or had "ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion." Defendant signed the form under the acknowledgement:

> "I understand all the foregoing statements, having asked for and obtained a translation or explanation of every point which was not understood or clear to me."

## Refugee Application Approved and Visa Clearance Granted

48. On July 20, 1998, based upon all of the information provided by defendant, as summarized above, the INS, Nairobi, Kenya Officer-in-Charge approved defendant's application for refugee status in the United States. The INS officer approved the application after finding defendant to be credible due to his story being "detailed and specific;" "internally consistent;" and "plausible in light of country conditions." The officer found that defendant established past persecution on account of imputed political opinion and the fact that the circumstances had "not substantially changed." The officer added:

18

> "[i]f anything, they've worsened with his brother's
> resignation from Tutsi government."

49.     In light of the above finding, also on about July 20, 1998, the INS, Nairobi,
Kenya Officer-in-Charge notified defendant and his family that their application for
refugee status in the United States had been conditionally approved.

50.     On about August 12, 1998, defendant and his family were accepted by the
Lutheran Immigration and Refugee Service for placement in Cedar Rapids, Iowa.

51.     On about September 10, 1998, the State Department advised the JVA Kenya
that defendant and his family had been granted Visa clearance by the United
States.

### Defendant and His Family Admitted to United States as Refugees

52.     On about December 9, 1998, defendant and his family were admitted to the
United States at New York, New York, as refugees.  Defendant and his family then
established residence in Cedar Rapids, Iowa.

### Application for Permanent Residence and to Adjust Status

53.     On about December 29, 1999, defendant completed, signed, and later
submitted an INS questionnaire directed to "All Parolees Applying for Permanent
Residence."  On that form, defendant falsely responded "no" to several questions,
including the following:

> Have you ever been involved in the persecution of anyone
> because of their race, religion, or political belief?

### INS Form I-485

54.     On about September 25, 2000, defendant signed, "under penalty of perjury"
and submitted to U.S. immigration officials, an "Application to Register Permanent

19

Resident or Adjust Status", INS Form I-485.  Defendant's false responses to

questions on the form included the following:

a. Defendant indicated "None" in response to a question that directed him to "List your present and past membership or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States, or in any other place since your 16th birthday."

b. Defendant responded by putting an "X" in the box marked "No" in response to the following question: "Have you ever, in or outside the U.S. ... knowingly committed any crime of moral turpitude . . . for which you have not been arrested?"

c. Defendant responded by putting an "X" in the box marked "No" in response to the following question: "Have you ever . . . knowingly encouraged, induced, assisted, abetted or aided any alien to try to enter the U.S. illegally."

d. Defendant responded by putting an "X" in the box marked "No" in response to the following question: "Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion?"

e. Defendant responded by putting an "X" in the box marked "No" in response to the following question: "Do you plan to practice polygamy in the U.S.?"

f. Defendant responded by putting an "X" in the box marked "No" in response to the question that asked, "Have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit?"

## Application to Adjust Status Granted

55.  The Application to Adjust Status to that of Lawful Permanent resident of the United States, filed by defendant, was approved on about March 1, 2002, and deemed effective as of December 9, 1998.

## Application for Naturalization
### INS Form N-400

56.  On or about May 15, 2003, in Cedar Rapids, Iowa, defendant signed and certified "under penalty of perjury" an Application for Naturalization, Form N-400. Thereafter, the application was mailed from Cedar Rapids, Iowa, to the "U. S. INS Nebraska Service Center"[2] in Omaha, Nebraska, where it was received on about November 25, 2003. Defendant's responses to the questions on the form included the following false responses:

> a.  In response to a statement on the form asking the defendant to state the name of any prior spouse, defendant responded "N/A."
>
> b.  In response to a question on the form that asked, "How many sons and daughters have you had? – defendant responded by placing the numeral "8" in the box.
>
> c.  In response to a question on the form that asked, "Have you EVER been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?" (emphasis in the original), the defendant responded by placing a check in the box marked "No" and did not disclose his membership in, and association with one or more political party in Rwanda.

---

[2]  The Department of Homeland Security (DHS) was created on March 1, 2003, the INS was then abolished.  The DHS became the successor organization to INS for determining immigration benefit applications.  For purposes of this indictment, "INS" shall refer to the Immigration and Naturalization Service and its successor agency, DHS.

d. In response to a question on the form that asked, "Have you EVER persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion?" (emphasis in the original), the defendant responded by putting a check in the box marked "No."

e. In response to a question on the form that asked, "Have you EVER committed a crime or offense for which you were NOT arrested?" (emphasis in the original), the defendant placed a check in the box marked "No."

f. In response to a question on the form that asked, "Have you EVER been married to more than one person at the same time?" (emphasis in the original), the defendant responded by placing a check in the box marked "No."

g. In response to a question on the form that asked, "Have you EVER given false or misleading information to any U.S. official while applying for any immigration benefit or to prevent deportation, exclusion or removal?" (emphasis in the original), the defendant responded by placing a check in the box marked "No."

h. In response to a question on the form that asked, "Have you EVER lied to any U.S. government official to gain entry or admission into the United States?" (emphasis in the original), the defendant responded by placing a check in the box marked "No."

## Review of INS Form N-400

57. On about October 28, 2004, a United States immigration officer personally met with defendant to discuss and review defendant's completed Form N-400. In the course of that meeting, defendant specifically reaffirmed his answers on the completed form, including the false responses to the effect that defendant: had no children other than those listed on the form; had never committed a crime or offense for which he had not been arrested; had never helped anyone enter or try to enter

22

the United States illegally; had never given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal; had never lied to any U.S. government official to gain entry or admission into the United States. Defendant again signed the form under the penalty of perjury, attesting that the contents of the form were true and correct.

## Application for Naturalization Granted

58.    On or about October 28, 2004, in Omaha, Nebraska, defendant's Application for Naturalization was granted, and on about November 19, 2004, in Des Moines, Iowa, defendant took the applicable oath and became a citizen of the United States.

## Count One
### Unlawfully Procuring or Attempting to
### Procure Naturalization or Citizenship

59.    Paragraphs 1 through 58, above, are hereby re-alleged and incorporated as if fully set forth herein.

60.    Beginning in at least March 1998 and continuing thereafter through at least November 19, 2004, in the Northern District of Iowa and elsewhere, the defendant, Gervais (Ken) Ngombwa, did knowingly procure and attempt to procure his own naturalization and that of Antoinette Mukakabanda, Faustine Ngayaberura, Gilbert Mugarula, Juvenary Hakizimana, Josiane Uwera, Louise Usanase, Grevais Murwanashyaka, and Antoinette Uwanagombwa, contrary to law, including in violation of Title 8, United States Code, Sections 1427,1429, and 1182; and Title 18, United States Code, Sections 2, 1001(a)(2) & (3), 1015(a), and 1546(a).

23

## Manner and Means

61.     Defendant and others known to the grand jury used variety of manner and

means to procure naturalization.  These included:

    a. Providing materially false, fictitious, fraudulent, and misleading statements, representations, and omissions to non-government organizations assisting the United States in the refugee resettlement process following the Rwandan genocide in an effort to procure refugee status;

    b. Providing materially false, fictitious, fraudulent, and misleading statements, representations, and omissions to United States agencies and employees, and on written documents,  in the course of the refugee application process in an effort to procure refugee status;

    c. Procuring authorization to travel and enter the United States as refugees, a prerequisite to  becoming a lawful permanent resident of the United States;

    d. Providing materially false, fictitious, fraudulent, and misleading statements, representations, and omissions to the United States INS, and on written documents, including on INS Form I-485, submitted to the United States, in the course of applying to adjust status to permanent resident status;

    e. Procuring permanent resident status in the United States, a prerequisite to becoming a naturalized citizen, based upon the above acts;

    f. Providing materially false, fraudulent and misleading information concerning material facts on the Application for Naturalization, the INS Form N-400; documents that were required to be completed truthfully as part of the process of becoming a naturalized citizen of the United States;

    g. As a result of the above acts, defendant and others known to the grand jury unlawfully procured citizenship in the United States.

62.   As defendant well knew, the false, fictitious, fraudulent, and misleading

statements, representations, and omissions included the following:

      a. Claiming multiple times that Faustine Twagiramungu was defendant's
         brother;

      b. Claiming Emmable (Aimable or Emabre) Kabanda was defendant's
         wife's brother;

      c. Failing to identify several of defendant's relatives including step
         relatives, defendant's siblings; several of defendant's wife's siblings, and
         others in the initial UNHCR Resettlement Registration and Referral
         interview;

      d. Claiming defendant had been specifically targeted after the
         assassination of President Habyarimana because of family political
         connections;

      e. Claiming in the initial UNHCR Resettlement Registration and Referral
         interview that defendant and his family fled on foot on April 9 or 10,
         1998;

      f. Claiming in the Case History that defendant had a brother in a high
         government position who had been imprisoned;

      g. Claiming on the JVA/Kenya Form I, that Felician Masumbuko, another
         refugee applicant was a distant relative of defendant;

      h. Claiming on the JVA/Kenya Form II, that Aron Bizumwami was the
         husband of a maternal aunt of defendant;

      i. Claiming on the JVA/Kenya Form III, that:

            1.  Twagiramungu was the oldest son of defendant's parents;
            2.  All of defendant's siblings, except Twagiramungu, were
               killed in 1994;
            3.  Juvenary Hakizimana was the child of defendant and
               Antoinette Mukakabanda;
            4.  Defendant had only been married once (including "legal,
               traditional, common-law, or other "unions" that produced
               children");
            5.  Antoinette Mukakabanda's parents were both deceased;

6. Aimable Kabanda was Antoinette Mukakabanda's brother; and
7. Antoinette Mukakabanda's sisters Eugenie Mukanyarwaya, and Jacqueline Mukanoheli were killed in 1994.

j. Claiming to the INS Nairobi Officer-in Charge, that:

1. Defendant had not been involved in killing or injuring any person after April 1, 1994, or encouraging others to participate in such killing or injury;
2. Defendant's brother Faustine Twagiramungu had been the Foreign Affairs Minister under the Habyarimana government;
3. Defendant's brother had been the Prime Minister in the RPF government;
4. Defendant's brother Faustine Twagiramungu was Prime Minister of the new Tutsi formed government between July 1994 and October 1995;
5. Defendant had no family members who had been members of the military;
6. Defendant and his wife had been arrested and, along with his mother-in-law, were beaten by the government forces;
7. The government forces who arrested defendant and his wife tried to trick him into confessing that they were helping the RPF; and
8. Defendant's wife's entire family had been killed prior to 1994;

k. Swearing under oath on the INS Form I-590, that:

1. The seven children accompanying defendant and his wife were defendant's only children;
2. Defendant had never been previously married; and
3. Defendant has not ever been a member of any "political, professional, or social organization;"

l. Swearing under oath on the INS Form G-646 that defendant was not an inadmissible alien because he had not:

1. Committed or been convicted of a crime "involving moral turpitude;
2. Been involved in assisting other aliens to enter the United States in violation of law;

26

3. Procured or attempted to procure a visa by fraud or misrepresentation; or

4. Ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion.

m. Answering "no" to the question on the questionnaire directed to "All Parolees Applying for Permanent Residence" that asked, "Have you ever been involved in the persecution of anyone because of their race, religion, or political belief?"

n. Swearing under oath on the INS Form I-485 to each of the matters stated at paragraph 49 above;

o. Swearing under oath on the INS Form N-400 to each of the matters stated at paragraph 51 above;

p. Re-affirming under oath, and in an interview with an immigration officer, each of the matters contained on the INS Form N-400 as stated at paragraph 52 above.

This was all in violation of Title 18, United States Code, Section 1425(a).

## Count Two
### Procurement of Citizenship or
### Naturalization Unlawfully

63. Paragraphs 1 through 58, and paragraphs 60 through 62, above, are hereby re-alleged and incorporated as if fully set forth herein.

64. Beginning in at least March 1998 and continuing thereafter through about November 19, 2004, in the Northern District of Iowa and elsewhere, the defendant, Gervais (Ken) Ngombwa, did knowingly procure, obtain, and apply for, and did attempt to procure and obtain naturalization and citizenship for himself, to which he was not entitled, in that:

a. defendant provided false and fraudulent information as to material facts in his Application for Naturalization, INS Form N-400, as set out above;

27

b. at the time of his application for naturalization, defendant was not lawfully admitted to the United States for permanent residence, including pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that defendant procured entry into, and refugee status in, the United States by providing false and fraudulent information as to material facts in a Registration for Classification as a Refugee, INS Form I-590, Sworn Statement of Refugee Applying for Entry into the United States, INS Form G-646, and when interviewed for purposes of completing the "Rwandan Questionnaire for Visa Applicants;"

c. at the time of his application for naturalization, defendant was not lawfully admitted to the United States for permanent residence, including pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that defendant did apply for and receive status as a lawful permanent resident of the United States, by providing false and fraudulent information as to material facts in an Application to Register Permanent Residence or Adjust Status, INS Form I-485;

d. at the time of his application for naturalization, defendant was not lawfully admitted to the United States for permanent residence, including pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that defendant was an inadmissible alien who had engaged in conduct that is defined as "genocide" for the purposes of the International Convention for the Prevention and Punishment of Genocide;

e. at the time of his application for naturalization, defendant could not satisfy the requirements for naturalization, including pursuant to Title 8, United States Code, Section 1427, in that he was not a person of "good moral character," in that defendant provided false testimony and information for the purpose of obtaining immigration benefits;

g. at the time of his application for naturalization, defendant could not satisfy the requirements for naturalization, including pursuant to Title 8, United States Code, Section 1427, in that he was not a person of "good moral character," in that defendant had participated in acts of genocide; and

h. at the time of his application for naturalization, defendant did not satisfy the requirements for naturalization, including those set forth in Title 8, United States Code, Section 1427.

65.    This was all in violation of Title 18, United States Code, Section 1425(b).

## REVOCATION OF CITIZENSHIP 8 U.S.C. § 1451(e)

66.    Upon conviction of Count One or Count Two, defendant, Gervais (Ken) Ngombwa's November 19, 2004, naturalization shall, by Court order, be revoked, set aside, and declared void, and defendant's certificate of naturalization shall, by the same order, be canceled.

This is pursuant to Title 8, United States Code, Section 1451(e).

## Count Three
## Conspiracy to Unlawfully Procure or Attempt
## to Procure Naturalization or Citizenship

67.    Paragraphs 1 through 58, and paragraphs 60 through 62, above, are hereby re-alleged and incorporated as if fully set forth herein.

68.    Between at least March 1998 and continuing until at least June 20, 2006, in the Northern District of Iowa and elsewhere, defendant, Gervais (Ken) Ngombwa, did knowingly and unlawfully conspire and agree with other persons known to the grand jury, to procure and attempt to procure the naturalization of one or more person(s), contrary to law.

## Manner and Means of the Conspiracy

69.    Defendant and others known to the United States used a variety of manner means to achieve the object of the conspiracy, including those set out at paragraph 59 above.

29

70.     In furtherance of the above conspiracy, and to effect the objects thereof, the

following overt acts, among others, were committed in the Northern District of

Iowa, and elsewhere:

a.  Each of the acts alleged at subparagraphs 60a though 60p, inclusive, are hereby re-alleged and incorporated as if set forth herein, with each act constituting a separate overt act.

b.  On March 11, 1998, defendant was interviewed by a UNHCR resettlement consultant at the Mkugwa, Tanzania, refugee camp near Kibondo, Tanzania.

c.  On about July 03, 1998, defendant signed an INS Form I-590, "Registration for Classification as a Refugee."

d.  On about July 3, 1998, Aron Bizumwami falsely claimed as part of the JVA/Kenya Resettlement Program that defendant was his nephew.

e.  On about July 3, 1998, Antoinette Mukakabanda signed a completed INS Form G-325A, titled "Biographic Information."

f.  Mukakabanda falsely claimed on the INS Form G-325A that her mother was deceased.

g.  On about July 3, 1998, Antoinette Mukakabanda signed a completed INS Form I-590, titled "Registration for Classification as Refugee."

h.  Mukakabanda falsely claimed Juvenary Hakizimana was her child.

i.  Mukakabanda failed on the form to report having a child named Kabanda.

j.  On July 7, 1998, defendant was interviewed as part of the JVA/Kenya Resettlement Program.

30

k. On July 20, 1998, defendant was interviewed by the INS, Nairobi, Kenya Officer-in-Charge.

l. On July 20, 1998, Antoinette Mukakabanda was interviewed by the INS, Nairobi, Kenya Officer-in-Charge.

m. Mukakabanda failed to report in the interview that Juvenary Hakizimana was not her child, but had another mother.

n. Mukakabanda failed to report in the interview having a child named Kabanda.

o. Mukakabanda falsely claimed in the interview that she had been arrested in the Kigali round-up in 1990.

p. On July 20, 1998, Faustine Ngayaberua was interviewed by the INS, Nairobi, Kenya Officer-in-Charge.

q. Ngayaberua claimed his uncle had been the prime minister of Rwanda between July 1994 and October 1995.

r. On July 20, 1998, Gilbert Mugarula was interviewed by the INS, Nairobi, Kenya Officer-in-Charge.

s. Mugarula claimed his uncle had been the prime minister of Rwanda between July 1994 and October 1995.

t. On July 20, 1998, Juvenary Hakizimana was interviewed by the INS, Nairobi, Kenya Officer-in-Charge.

u. Hakizimana claimed his uncle had been the prime minister of Rwanda between July 1994 and October 1995.

v. In about December 1998, defendant and his family established residence in Cedar Rapids, Iowa.

w. On about September 25, 2000, defendant signed and thereafter submitted to U.S. immigration officials, an "Application to Register Permanent Resident or Adjust Status", INS Form I-485.

x. On about September 25, 2000, defendant signed and thereafter submitted to U.S. immigration officials, an "Application to Register Permanent Resident or Adjust Status", INS Form I-485, on behalf of Louise Usanase.

y. On about September 25, 2000, defendant signed and thereafter submitted to U.S. immigration officials, an "Application to Register Permanent Resident or Adjust Status", INS Form I-485, on behalf of Josiane Uwera.

z. On about September 25, 2000, defendant signed and thereafter submitted to U.S. immigration officials, an "Application to Register Permanent Resident or Adjust Status", INS Form I-485, on behalf of Grevais Murwanashyaka.

aa. On about February 2, 2001, documents were sent by United States mail from Cedar Rapids to the INS Nebraska Service Center in furtherance of defendant's and others' applications to adjust to permanent resident status.

bb. On or about May 15, 2003, in Cedar Rapids, Iowa, defendant signed and certified "under penalty of perjury" an Application for Naturalization, INS Form N-400.

cc. On about November 22, 2003, defendant's, Mukakabanda's, and other INS Forms N-400 were mailed from Cedar Rapids, Iowa, to the INS Nebraska Service Center in Omaha, Nebraska.

dd. On about May 12, 2004, Mukakabanda falsely claimed in an interview with an INS officer that she had no children other than those listed on her completed INS Form N-400.

ee. On about July 9, 2004, Antoinette Mukakabanda took the oath of citizenship and became a naturalized citizen.

ff. On about July 9, 2004, Faustine Ngayabernba took the oath of citizenship and became a naturalized citizen. As part of

32

the process of becoming a citizen, he changed his name to Faustine Banner.

gg. On about July 9, 2004, Gilbert Mugarula took the oath of citizenship and became a naturalized citizen. As part of As part of the process of becoming a citizen, he changed his name to Gilbert Grant.

hh. On about July 9, 2004, Juvernary Hakizimana, took the oath of citizenship and became a naturalized citizen. As part of the process of becoming a citizen, he changed his name to Jesse Juvy Hakizimana.

ii. On about July 9, 2004, Josiane Uwera took the oath of citizenship and became a naturalized citizen.

jj. On about November 19, 2004, defendant Gervais Ngombwa took the oath of citizenship and became a naturalized citizen. As part of the process of becoming a citizen, he changed his name to Ken Ngombwa.

kk. On about June 20, 2006, Antoinette Uwangombwa, took the oath of citizenship and became a naturalized citizen.

ll. On about June 20, 2006, Louise Usanase took the oath of citizenship and became a naturalized citizen.

mm. On about June 20, 2006, Grevais Murwanashyaka took the oath of citizenship and became a naturalized citizen.

71.    This was all in violation of Title 18, United States Code, Section 371.

### Count Four
### Making a Materially False Statement

72.    On about October 15, 2014, in the Northern District of Iowa, in a matter

within the jurisdiction of the Department of Homeland Security, an agency within

the executive branch of the United States government, defendant, Gervais (Ken)

Ngombwa, knowingly and willfully made a false, fictitious, and fraudulent material statement and representation, in that the defendant claimed in an interview with Immigration and Customs Enforcement agents that defendant had never claimed Faustine Twagiramungu was his brother, when, as defendant well knew, defendant had previously made such a claim when seeking to gain refugee status to enter the United States.

This was in violation of Title 18, United States Code, Section 1001(a)(2).

Presented by:

KEVIN W. TECHAU
United States Attorney

By,

RICHARD L. MURPHY
Assistant United States Attorney

A TRUE BILL

/s/Foreperson
Foreperson

October 29, 2014

Date