**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

GERVAIS (KEN) NGOMBWA,

        Defendant.

No. 14-CR-123-LRR

**SENTENCING MEMORANDUM**

_____

*TABLE OF CONTENTS*

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.    RELEVANT PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . *2*

III.   SENTENCING FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

IV.   EVIDENTIARY RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*

V.     FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

    *A.*     *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
          *1.*     *1994 Rwandan genocide* . . . . . . . . . . . . . . . . . . . . . . *7*
          *2.*     *Refugee resettlement process* . . . . . . . . . . . . . . . . . . . *9*
    *B.*     *Trial Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*

VI.   FACT OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

    *A.*     *Genocide-Related Facts* . . . . . . . . . . . . . . . . . . . . . . . . *14*
    *B.*     *Family-Related Facts* . . . . . . . . . . . . . . . . . . . . . . . . . *20*
    *C.*     *Trial-Related Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . *25*

VII.  OVERVIEW OF GUIDELINES ISSUES . . . . . . . . . . . . . . . . . . . . . *29*

VIII. BASE OFFENSE LEVEL & SPECIFIC OFFENSE CHARACTERISTICS   *30*

    *A.*     *Ex Post Facto Clause* . . . . . . . . . . . . . . . . . . . . . . . . . *31*
    *B.*     *Concealment of Serious Human Rights Offense* . . . . . . . . . . . . *35*

IX.   ADJUSTMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *37*

    *A.*     *Role in Offense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *38*
    *B.*     *Obstruction of Justice* . . . . . . . . . . . . . . . . . . . . . . . . *40*

X.      *PRE-DEPARTURE GUIDELINES RANGE*  . . . . . . . . . . . . . . . . . . . . **41**

XI.     *DEPARTURES* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

        A.      *Under-Representation of Criminal History* . . . . . . . . . . . . . . . . **42**
        B.      *Aggravating Circumstances* . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

XII.    *CONCLUSION*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **47**

## I.  INTRODUCTION

The matter before the court is the sentencing of Defendant Gervais (Ken) Ngombwa.

## II.  RELEVANT PROCEDURAL HISTORY

On October 30, 2014, a grand jury returned a four-count Indictment (docket no. 2) charging Defendant with (1) unlawfully procuring or attempting to procure naturalization or citizenship, in violation of 18 U.S.C. § 1425(a); (2) procuring or attempting to procure citizenship to which a person is not entitled, in violation of 18 U.S.C. § 1425(b); (3) conspiring to unlawfully procure or attempt to procure citizenship, in violation of 18 U.S.C. §§ 371 & 1425(a); and (4) making a materially false statement, in violation of 18 U.S.C. § 1001(a)(2).  Defendant proceeded to trial.  At trial, Assistant United States Attorneys Richard Murphy and Ravi Narayan represented the government.  Assistant Federal Public Defender B. John Burns III ("trial counsel") represented Defendant.  The trial was translated into the Kinyarwanda language by interpreters Jacqueline Adam and Zenaide Ntiranyibagira.  On January 15, 2016, the jury unanimously found Defendant guilty of all four counts alleged in the Indictment and made specific findings regarding the overt acts undertaken as part of the conspiracy alleged in Count 3.  *See* Jury Verdicts (docket no. 120).

After the jury trial, Attorney Raphael Scheetz entered an appearance on behalf of Defendant and trial counsel withdrew.  *See* docket nos. 125, 126, 127.  On May 13, 2016, the court held a hearing on Defendant's Motion for New Trial (docket no. 131).  *See* May 13, 2016 Minute Entry (docket no. 156).  On May 23, 2016, the court denied the Motion

for New Trial. *See* May 23, 2016 Order (docket no. 161). On September 2, 2016, the court entered an Order (docket no. 196) indicating that Defendant's conviction on Count 1 of the Indictment would be vacated at the time of sentencing.

On March 23, 2016, the United States Probation Office ("USPO") filed a Draft Presentence Investigation Report ("Draft PSIR") (docket no. 140). On April 20, 2016, both Defendant and the government filed objections to the Draft PSIR. *See* Gov't PSIR Objections (docket no. 150); Defense Objections to Draft PSIR (docket no. 151). On July 7, 2016, the USPO filed a Second Revised Final Presentence Investigation Report ("Final PSIR") (docket no. 172). On August 19, 2016, the government filed a Sentencing Brief ("Gov't Brief") (docket no. 194) and Defendant filed a Sentencing Memorandum ("Defense Brief") (docket no. 195), both of which addressed the contested sentencing issues identified in the Final PSIR. On September 16, 2016, the government filed a Response ("Government Response") (docket no. 197) to the Defense Brief.

On September 22 and 23, 2016, the court held a two-day sentencing hearing ("Hearing"), at which it received evidence. *See* Sept. 22, 2016 Minute Entry (docket no. 202); Sept. 23, 2016 Minute Entry (docket no. 203). Assistant United States Attorneys Murphy and Narayan represented the government. Attorney Scheetz represented Defendant, who was personally present. The Hearing was translated into the Kinyarwanda language by interpreters Adam and Ntiranyibagira. The court advised the parties that it would take the contested sentencing issues under advisement, issue this Sentencing Memorandum and then reconvene the Hearing to impose sentence. The Hearing is scheduled to reconvene on March 2, 2017 at 9:00 a.m. *See* Order Continuing Sentencing Hearing (docket no. 210).

All contested sentencing issues are now fully submitted and ready for decision.

### III. SENTENCING FRAMEWORK

"The [United States Sentencing] Guidelines are 'the framework for sentencing' and 'anchor . . . . the district court's discretion.'" *Molina-Martinez v. United States*, 136 S.Ct. 1338, 1345 (2016) (second alteration in original) (quoting *Peugh v. United States*, 133 S.Ct. 2072, 2083, 2087 (2013)). "At the outset of the sentencing proceedings, the district court must determine the applicable Guidelines range." *Id.* at 1342; *see also United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008) ("The district court should begin with a correct calculation of the advisory Sentencing Guidelines range." (citing *Gall v. United States*, 552 U.S. 38, 49 (2007))). "The court then entertains the parties' arguments regarding an appropriate sentence, including whether the sentence should be within the Guidelines range or not." *Molina-Martinez*, 136 S. Ct. at 1342; *see also United States v. Omoware*, 761 F.3d 951, 952 (8th Cir. 2014) (following this same procedure); *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008) ("A Guidelines sentence is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted."). "Although the district court has discretion to depart from the Guidelines, the court 'must consult those Guidelines and take them into account when sentencing.'" *Molina-Martinez*, 136 S. Ct. at 1342 (quoting *United States v. Booker*, 543 U.S. 220, 264 (2005)).

"[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall*, 552 U.S. at 50); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."). "A district court has substantial leeway in

deciding how to weigh the § 3553(a) factors." *United States v. Sholds*, 827 F.3d 758, 760 (8th Cir. 2016); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." (quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008))). If the court determines that a sentence outside of the applicable Guidelines range is warranted, it "must 'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Martinez*, 821 F.3d 984, 989 (8th Cir. 2016) (quoting *Feemster*, 572 F.3d at 461). "[A] district court, after settling on the appropriate sentence, 'must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *United States v. Chavarria-Ortiz*, 828 F.3d 668, 670 (8th Cir. 2016) (quoting *Gall*, 552 U.S. at 50).

## IV. EVIDENTIARY RULES

"When the district court applies the guidelines in an advisory manner . . . 'judicial fact-finding using a preponderance of the evidence standard is permitted.'" *United States v. Shield*, 831 F.3d 1079, 1083 (8th Cir. 2016) (quoting *United States v. Ademi*, 439 F.3d 964, 966 (8th Cir. 2006)); *see also United States v. O'Brien*, 560 U.S. 218, 224 (2010) ("Sentencing factors . . . can be proved to a judge at sentencing by a preponderance of the evidence.") The court may consider a wide variety of evidence, including the undisputed portions of the PSIR, as well as the testimony and other evidence the parties introduced at the trial and at the Hearing. *See, e.g.*, *Shield*, 831 F.3d at 1083 ("Under an advisory sentencing regime, the district court is entitled to determine sentences based upon judge-found facts and uncharged conduct where the defendant is not sentenced in excess of the statutory maximum." (internal quotation marks omitted) (quoting *United States v. Bridges*, 569 F.3d 374, 377 (8th Cir. 2009))). The court does not "put on blinders" and consider

only the evidence directly underlying Defendant's offenses of conviction. In calculating Defendant's Guidelines range, for example, the court applies the familiar doctrine of relevant conduct. *See* USSG § 1B1.3. The Eighth Circuit has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g.*, *United States v. Thomas*, 760 F.3d 879, 889 (8th Cir. 2014). "The rules of evidence . . . do not apply in the context of sentencing hearings, and courts may rely on hearsay or other typically inadmissible evidence if that evidence bears sufficient indicia of reliability." *United States v. Azure*, 596 F.3d 449, 454 (8th Cir. 2010). The sentencing judge is afforded great discretion in determining the credibility of witnesses and making findings of fact. *See Bridges*, 569 F.3d at 378.

## V. FACTS

The court finds the following facts from the jury's findings, the uncontested portions of the Final PSIR and the evidence presented at trial, the hearing on the Motion for New Trial and the Hearing. The court also relies on contested portions of the Final PSIR where evidence introduced at trial or the Hearing establishes the facts contained therein by a preponderance of the evidence. *See Shield*, 831 F.3d at 1083. The court shall make additional factual findings, as necessary, when resolving Defendant's factual objections and during its legal analysis.

### A. Background

To understand the materiality of the false statements made by Defendant and others, it is necessary to review background information relating to the 1994 Rwandan genocide and the process by which Rwandan refugees were subsequently approved for resettlement in the United States.

## 1. *1994 Rwandan genocide*

Rwanda is a small country in East Africa with a population, as of 1994, of approximately eight to ten million people. At the time of the genocide, Rwanda's population consisted primarily of three ethnic groups: 85% Hutu, 14% Tutsi and 1% Twa.

Historically, Rwanda was controlled by a Tutsi monarch, who exercised governmental control over the country. In the late-1950s, however, a Hutu politician named Grégoire Kayibanda organized the MDR party, which sought to seize control of Rwanda on behalf of the Hutu majority. In their pursuit of a Hutu government, Kayibanda and the MDR party embarked on a campaign of actual and threatened violence against Tutsis, which resulted in tens of thousands of Tutsis fleeing the country. By 1962, the Tutsi monarchy was abolished and Kayibanda was installed as president. Kayibanda threatened genocide against Tutsis if the exiled Tutsis ever returned to Rwanda. In 1973, Kayibanda was overthrown by Juvénal Habyarimana of the MRND party. Like Kayibanda, Habyarimana was a Hutu who maintained Hutu control over the Rwandan government.

Following the Hutu usurpation of the Rwandan government, a group of exiled Tutsis formed the Rwandan Patriotic Front ("RPF"). In 1990, the RPF, led by Paul Kagame, invaded Rwanda and attempted to overthrow Habyarimana's regime and secure the return of the Tutsis previously exiled by Kayibanda. The RPF's conflict with the Habyarimana government escalated into a years-long civil war. During the conflict, Hutu politics were represented by three separate parties: (1) the MRND party—Habyarimana's party that maintained power of Rwandan government at the time of the civil war; (2) the MDR-POWER party—an extremist Hutu offshoot of Kayibanda's version of the MDR party, which advocated for genocide against the Tutsis in accordance with Kayibanda's earlier threats; and (3) the MDR party—a moderate Hutu party led by Faustin Twagiramungu, which distanced itself from Kayibanda's views and advocated for Hutu and Tutsi

coexistence within Rwandan government. Additionally, during the civil war, the MRND established a youth militia called the Interahamwe.

In 1993, Hutu and Tutsi political leaders negotiated a truce that became known as the Arusha Accords. The Arusha Accords provided for shared control of the Rwandan government between the Hutus and Tutsis. The Arusha Accords designated Twagiramungu of the MDR to serve as prime minister, Habyarimana of the MRND to remain president and certain members of the RPF to occupy cabinet-level positions. The Arusha Accords were unpopular with extremist Hutus, who disapproved of the amount of government power granted to the Tutsis. Because of the extremist Hutus' resistance, implementation of the Arusha Accords did not fully materialize.

In April of 1994, Habyarimana attended a conference in Tanzania wherein he reaffirmed his commitment to implementing the Arusha Accords. On Habyarimana's return flight to Rwanda, his plane was shot down and he was killed. Hutu extremists blamed Habyarimana's assassination on the RPF and the moderate Hutus who assisted the Tutsis in gaining access to Rwandan government. The Hutu extremists—led by MDR-POWER and the Interahamwe—responded to Habyarimana's assassination with an organized wave of mass violence against Tutsis and perceived Tutsi-sympathizers like Twagiramungu. Between 500,000 and one million people were killed in Rwanda during this period, which became known as the Rwandan genocide. The genocide lasted approximately one hundred days, at which point the RPF secured the country and put an end to the violence.

Because of the massive scale of the violence that occurred during the genocide, Rwandan communities were tasked with prosecuting large numbers of genocide perpetrators. Rwandan communities utilized a system of locally run courts, known as "gacaca courts," to oversee the prosecutions. A genocide prosecution in the gacaca courts involved four distinct phases. First, the local population took stock of the damage done

to their community—identifying who had been killed, who was missing, what property was damaged and what persons were suspected of being responsible. Second, community members compiled evidence to support allegations against the suspects identified in the first phase. Third, suspects were provided an opportunity to respond to the accusations against them and to provide evidence in their defense. Fourth, judges of the gacaca court weighed the evidence and, ultimately, issued their judgment.

### 2. *Refugee resettlement process*

During the genocide, many Rwandans were able to flee the country. Refugee camps were established in neighboring countries to take in the Rwandan refugees.

Among the refugees housed at the camps, the United Nations High Commissioner for Refugees ("UNHCR") designated certain groups as being particularly in danger of persecution and, therefore, particularly suitable for resettlement in other countries. Representatives of various humanitarian organizations would interview resettlement applicants that belonged to these particular groups. The purpose of the interviews was to elicit information that would be relevant to countries accepting refugees, including the United States, as they determined whether to accept an applicant for resettlement. For example, interviewers would question applicants about their family history, their reasons for leaving Rwanda and their beliefs as to why they could not return to Rwanda. Local interpreters translated the interviewers' questions and the applicants' responses, and the interviewers documented the applicants' information on various forms. The humanitarian organizations then sent the applications to countries accepting refugees. In turn, these countries reviewed the applications to determine resettlement eligibility.

Applications sent to the United States were reviewed by the United States Immigration and Naturalization Service ("INS"). After reviewing applications, the INS conducted additional interviews with applicants before approving them for resettlement in the United States. The INS first conducted brief interviews with the applicant's entire

family before conducting a more detailed interview with the principal applicant (who was generally the head of household). The purpose of the INS interviews was to more conclusively determine whether applicants were eligible for refugee resettlement under the laws of the United States.[1] The INS was not capable of performing thorough fact investigations of applicant responses. However, applicants were placed under oath during interviews, and INS officials gauged credibility by assessing the detail and consistency of applicant responses, as well as the believability of responses in light of known circumstances in Rwanda during the genocide. As with the preliminary interviews conducted by the humanitarian organizations, local interpreters translated the interviewers' questions and the applicants' responses. If an applicant was approved for resettlement following the INS interview, the INS official would document the approval and the United States Department of State would authorize the applicant to travel to the United States for resettlement.

## B. Trial Evidence

The evidence at trial established the following.

Defendant is a Rwandan Hutu. He is married to Antoinette Mukakabanda, a Tutsi. Defendant and Mukakabanda lived in Rwanda before ultimately leaving the country during

---

[1] At the time Defendant applied for refugee status, the United States accepted refugees only if: (1) the applicant previously suffered persecution or had a well-founded fear of future persecution based on race, religion, nationality, political opinion or group affiliation, and (2) the applicant had no role in the persecution of others based on race, religion, nationality, political opinion or group affiliation. *See* 8 U.S.C. § 1101(a)(42). Applicants satisfying the requirements for refugee status were further required to show that they were not otherwise barred from admission into the United States on other grounds, including: (1) the commission of fraud in the admission process, *see* 8 U.S.C. § 1182(a)(6)(C)(i); (2) the commission of crimes involving moral turpitude, *see* 8 U.S.C. § 1182(a)(2)(A)(i)(I); or (3) participation in genocide, *see* 8 U.S.C. § 1182(a)(3)(E)(ii). The spouse and children of a principal applicant for refugee status were qualified for refugee status to the same extent as the principal applicant.

the genocide. Upon leaving Rwanda, Defendant and Mukakabanda resided in the Mkugwa Refugee Camp in Tanzania.

The UNHCR considered refugees in "mixed" Hutu-Tutsi marriage, like Defendant and Mukakabanda, to be vulnerable to persecution and, therefore, prioritized such applicants for resettlement. Accordingly, in March and July of 1998, humanitarian officials interviewed Defendant and his family to gather information relevant to the resettlement process. During the interviews, Defendant made several false statements. First, he falsely claimed that he was the brother of the moderate Hutu leader Twagiramungu and that, due to this relationship, Defendant was the target of anti-Tutsi violence during the genocide—when in fact, Defendant and Twagiramungu are unrelated. Second, he falsely claimed that he was related to other adult refugees residing in the Mkugwa Refugee Camp, including an individual named Aaron Bizumwami—when in fact, Defendant and the other refugees are unrelated. Third, he failed to disclose various relatives when asked to name relatives that remained in Rwanda—when in fact, Defendant had numerous living relatives that remained in Rwanda. Fourth, he falsely claimed that certain children were his own biological children with Mukakabanda—when in fact, certain of those children were Defendant's nephews and another was Defendant's child with a woman named Alvira Nyramacumbi. Fifth, Defendant falsely claimed that he had no other marriage except for his marriage to Mukakabanda—when in fact, he had been previously married to Nyramacumbi.

In Defendant's follow-up interview with the INS in July of 1998, he reaffirmed certain false statements made in his interviews with the humanitarian organizations, and made further false statements. First, he falsely denied having relatives that were members of the military—when in fact, two of Defendant's half-brothers were members of the Rwandan military. Second, he falsely claimed that he, Mukakabanda and Mukakabanda's

mother had been arrested and beaten by the RPF in 1990, before the genocide began—when in fact, Defendant and Mukakabanda later denied that such events occurred.

The INS officer responsible for Defendant's application, Joe Martin, testified that Defendant's false statements were material to his decision to approve Defendant for resettlement. Martin testified that Defendant's false statement that Twagiramungu was his brother was one of the primary reasons for approving Defendant's resettlement. Martin emphasized that truthfulness was critical during INS interviews because false statements prevented further inquiry into concealed true information. The inability to pursue such further inquiry would prevent the INS officer from gathering information potentially material to resettlement eligibility.

Based on Defendant's false statements to the humanitarian organizations and to the INS, Defendant was approved for resettlement to the United States. Once in the United States, Defendant secured permanent residence status and, eventually, naturalization as a United States citizen. In his permanent residence application, Defendant reaffirmed the false statements from his resettlement application by selecting "No" to the question, "[H]ave you, by fraud or willful misrepresentation of a material fact, ever sought to procure . . . entry into the U.S. or any immigration benefit?" Gov't Ex. 9 (docket no. 116-12) at 4. In his naturalization application, Defendant reaffirmed the false statements from his resettlement application by selecting "No" to the questions, "Have you EVER given false or misleading information to any U.S. government official while applying for any immigration benefit . . . ?" and "Have you EVER lied to any U.S. government official to gain entry or admission into the United States?" Gov't Ex. 11 (docket no. 116-14) at 8.

On October 15, 2014, Defendant was interviewed by agents of the Immigration and Customs Enforcement office of the Department of Homeland Security ("DHS"). During the interview, Defendant made a series of statements contradicting statements that he made

during the resettlement process. First, Defendant told the agents that one of the children that he had claimed as his son with Mukakabanda was, in fact, his son with Nyramacumbi. Second, Defendant acknowledged that he had half-brothers that were members of the Rwandan military. Third, Defendant claimed that he, Mukakabanda and Mukakabanda's mother were never arrested and beaten by the RPF. Fourth, Defendant stated that Twagiramungu was not his brother and he denied ever claiming that he was his brother—even when confronted with documents created during the resettlement process.

Based on the evidence presented at trial, the jury unanimously found Defendant guilty of all four counts charged against Defendant, and made particularized findings as to the overt acts carried out in furtherance of the conspiracy charged in Count 3.

## VI. FACT OBJECTIONS

In the "Offense Conduct" section of the Final PSIR, the USPO lists facts comprising the relevant conduct of Defendant's offenses. *See* Final PSIR ¶¶ 5-43I. Many of the facts were established at trial and are discussed above. Many other facts relate to other relevant conduct, including Defendant's actions prior to and during the Rwandan genocide.

Defendant makes several objections to the facts included in the Final PSIR. *See* Defense Objections to Draft PSIR; Defense Objections to Revised Draft PSIR (docket no. 171). Specifically, Defendant objects to the following facts: (1) Defendant was a member and leader of MDR-POWER; (2) Defendant actively participated in the Rwandan genocide; (3) Defendant was not married to Mukakabanda while living in Rwanda; (4) Defendant is a Hutu; (5) Defendant made intentional false statements during the resettlement process; (6) Defendant claimed to be the brother of Twagiramungu; (7) the basis for Defendant's resettlement rested primarily on his claim that he was the brother of Twagiramungu; (8) Defendant had brothers in the Rwandan military; (9) one of Defendant's brothers in the Rwandan military guarded Defendant's home and family after the Rwandan genocide began; (10) Defendant was married to Nyramacumbi; (11) Defendant and Mukakabanda

falsely claimed that Mukakabanda's son was instead Mukakabanda's brother; (12) Defendant demonstrated English-language proficiency during a June 2014 interview; (13) Defendant committed perjury when testifying at trial; (14) Mukakabanda made false statements in an April 2014 interview; (15) Defendant is unconcerned for his safety if returned to Rwanda; (16) Defendant concealed the identify of the mother of one of his sons until confronted with the truth in an October 2014 interview; (17) Defendant concealed the fact that certain of his claimed children were not his biological children until confronted with the truth in December of 2014; and (18) Defendant agreed with trial counsel that it was in his best interest not to call family members to testify at trial. Certain of these eighteen objections were raised in connection with multiple paragraphs in the Final PSIR.

Defendant's objections can be roughly grouped into three categories. The first relates to Defendant's ties to the Rwandan genocide—numbers (1), (2), (4), (8), (9) and (15) above. The second relates to Defendant's family composition—(3), (10), (11), (14), (16) and (17). The third relates to various trial issues—(5), (6), (7), (12), (13) and (18). The court shall address each category of objections in turn.

### A. Genocide-Related Facts

The Final PSIR includes facts that Defendant was a member and leader of the Hutu extremist group MDR-POWER and participated in numerous acts of violence during the Rwandan genocide, alongside one of his two brothers from the Rwandan military. Defendant objects to these facts.

The court first finds that Defendant was a Hutu. Defendant testified at trial that his father was a Hutu and his mother was a Tutsi. Evidence at trial and the Hearing established that, in Rwanda, a person's ethnicity is determined by the ethnicity of his or her father—such that a Hutu father's children are deemed to be Hutus, regardless of whether their mother is a Tutsi. Consistent with this norm, people who knew Defendant in Rwanda considered him to be a Hutu. Additionally, Defendant and Mukakabanda were

placed in the Mkugwa camp because of their mixed Hutu-Tutsi marriage, lending further support for the fact that Defendant is a Hutu, given that it is undisputed that Mukakabanda is a Tutsi. In light of this evidence, the court overrules Defendant's objection to the fact that he is a Hutu.

The court also finds that Defendant had half-brothers in the Rwandan military. The government introduced Rwandan government records reflecting that Defendant's half-brothers Jean Nepomuscene Ndemezo and Jean Damascene Rwabidadi were members of the Rwandan Army. *See* Gov't Ex. 14 (docket no. 116-17). Retired DHS Agent Frank Hunter testified at the Hearing that he reviewed records from military trial proceedings that further confirmed that Ndemezo and Rwabidadi were members of the military. Rwabidadi was tried and sentenced before a military tribunal and personally acknowledged his membership in the Rwandan army on separate occasions. *See* Gov't Ex. 34 (docket no. 208-1) at 8; Gov't Ex. 36 (docket no. 208-2) at 3. Additionally, Defendant admitted at trial that Ndemezo and Rwabidadi were his half-brothers, insofar as they had the same father but different mothers. Defendant acknowledged that Ndemezo and Rwabidadi's names appear as siblings in his resettlement materials—albeit misspelled. *See* Gov't Ex. 4 (docket no. 116-7) at 3 (listing "Demezo, Jean Pomuseni" and "Gwabitati, Jean Demasine"). To the extent that Defendant objects to the Final PSIR's characterization of Ndemezo and Rwabidadi as "brothers" instead of "half-brothers," the court sustains the objection in light of the fact that they had different mothers than Defendant.[2] However, to the extent that Defendant objects to the fact that his half-brothers were members of the Rwandan military, the court overrules Defendant's objection.

_____

[2] Although the court recognizes that Ndemezo and Rwabidadi are technically Defendant's "half-brothers," the evidence at trial—including Defendant's own testimony—established that Defendant refers to them simply as "brothers." In any event, the court does not find the "brother" versus "half-brother" distinction to have any impact on the other facts contained in the Final PSIR.

The court also finds that Defendant's half-brother, Rwabidadi, protected Defendant's home when the Rwandan genocide began. Rwabidadi testified to this fact at his military trial and during an interview while serving his prison sentence. *See* Gov't Exs. 34, 36. Rwabidadi stated that he left his military outpost when the genocide began and returned first to his wife's family's home before ultimately proceeding to Defendant's home to protect Defendant's family and home. The court finds Rwabidadi's account to be credible for three reasons. First, his account—returning to his wife's family's home and then to Defendant's home—remained consistent between his 1997 trial and his 2011 interview from prison. Second, during his testimony in his military trial, Rwabidadi recounted specific details from the time he spent guarding Defendant's home. For example, Rwabidadi testified that he met a man whom he invited to seek refuge at Defendant's home to escape the violence, but the man refused to do so because he feared Defendant. Third, the court can identify no compelling reason for Rwabidadi to fabricate this particular portion of his story. Even if Rwabidadi had a self-interested motivation to testify falsely at his military trial, falsely testifying to this particular fact would have no material benefit to him, in the court's view. And, in any event, Rwabidadi's account remains consistent even as he presently serves a life sentence in prison, such that no benefit of maintaining a falsehood remains. Accordingly, the court overrules Defendant's objection to the fact that Rwabidadi guarded Defendant's home during the Rwandan genocide.

The court also finds that Defendant was a member and leader of MDR-POWER. The government introduced material from "[t]he official journal written by the MDR's main office," which identifies Defendant as attending the MDR National Special Assembly, held in Kigali, Rwanda. *See* Gov't Ex. 35 (docket no. 124-5). Agent Hunter testified that this assembly marked the occasion when the MDR party split into two separate parties: the moderate MDR party, which was amenable to reintegration of the

exiled Tutsis, and the extremist MDR-POWER party, which was staunchly anti-Tutsi. The government introduced additional evidence that, after the MDR split into two parties, Defendant became a local leader of MDR-POWER in his native Nyamata. First, in a judgment of conviction issued against Defendant in the Muriendo gacaca court, it identifies Defendant as a member of MDR-POWER. *See* Gov't Ex. 25 (docket no. 124-1). Second, Rwabidadi repeatedly stated that Defendant was a member of MDR-POWER, and stated that that was why the man he encountered near Defendant's home feared Defendant. *See* Gov't Ex. 34 at 7-8. Third, witnesses that lived in the same community as Defendant prior to and during the genocide stated that he was a member of MDR and MDR-POWER. Many witnesses stated that they saw Defendant transporting and directing groups of the Interahamwe youth militia in preparation for and during the genocide. Agent Hunter testified that the Interahamwe aligned with MDR-POWER after the National Special Assembly—indicating that Defendant did as well, based on his leadership and direction of the group. Defendant argues that he could not be a member of MDR-POWER because he was married to a Tutsi woman and had a Tutsi mother. However, evidence at the Hearing established that it was not uncommon for prominent Hutu men to take Tutsi wives, regardless of their attitudes toward Tutsis as a group. Further, as the court discussed above, Defendant was a Hutu by Rwandan cultural norms, despite his mother being a Tutsi. As such, the court does not find Defendant's relationships to Tutsis to foreclose his membership in MDR-POWER. Defendant also attacks the evidence linking him to MDR-POWER on grounds that it is not credible. However, the court finds such attacks to be unfounded. The government's evidence originates from numerous sources—an MDR party publication, a local gacaca court, Defendant's brother, Defendant's neighbors in Rwanda and witnesses to Defendant's actions during the genocide—such that each source corroborates the others. Therefore, the court finds the evidence credible and sufficient to

establish Defendant's ties to MDR-POWER. Accordingly, the court overrules Defendant's objection to the fact that he was a member and leader of MDR-POWER.

The court also finds that Defendant actively participated in the Rwandan genocide. Numerous eyewitnesses attested to this fact during interviews with Agent Hunter and his fellow agents. *See* Gov't Exs. 70-99 (docket nos. 207-2, 207-3, 207-4, 207-5). These witnesses provided detailed accounts of various acts of violence committed by Defendant. While in-depth summaries of the accounts are unnecessary, they generally describe that Defendant personally killed numerous Tutsis, transported and directed the Interahamwe to kill Tutsis, looted Tutsi property and led brutal attacks on groups of Tutsis seeking refuge in locations such as the local church, a priests' compound, the Kanzenze commune office and Kayumba Hill. The court finds the witness accounts credible for many reasons. First, the accounts largely corroborate each other, insofar as many of the witnesses describe Defendant's role in the same episodes of violence. Second, personal characteristics of the witnesses establish a strong foundation for their knowledge of Defendant's conduct: the witnesses knew and lived alongside Defendant in Nyamata prior to and during the genocide; the witnesses all experienced the genocide, and Defendant's role within it, firsthand—some as Tutsis who survived the violence and others as Hutus that participated in the violence; and, with very few exceptions, the witnesses were able to identify Defendant from a photo array. Third, Agent Hunter and his colleagues took careful steps to ensure the credibility of the witness accounts. Agent Hunter conducted the interviews in an open-ended fashion, wherein he asked witnesses about their experiences during the genocide without signaling that he was investigating any individual perpetrator. To that end, Agent Hunter did not provide witnesses with prior statements from which they might infer a specific purpose of the interview. In fact, Agent Hunter himself had no knowledge of prior testimony given by the witnesses, but knew only that certain witnesses had previously testified in gacaca court proceedings. When witnesses provided details that

Agent Hunter found potentially relevant to his investigation, he pursued follow-up questions to elicit further information. For example, when witnesses testified about the political parties in Nyamata, Agent Hunter asked if they knew the leaders of the parties—in response, the witnesses routinely identified Defendant as a leader of MDR-POWER. Additionally, Agent Hunter omitted the Rwandan government from the interview process to the fullest extent possible, alleviating concerns that witnesses would alter their testimony to please their government. Witnesses were also kept separated during the interview period to prevent collusion. Fourth, witness accounts during interviews with Agent Hunter comport with the findings of two separate gacaca courts that convicted Defendant of acts of genocide. *See* Gov't Ex. 25; Gov't Ex. 26 (docket no. 124-2). Because of the credible witness accounts connecting Defendant to the violence of the genocide, the court overrules Defendant's objection to the fact that he was an active participant in the Rwandan genocide.

The court does not find, however, that Defendant lacks concern for his safety if returned to Rwanda. In a June 2014 interview with Agents Hunter and Mike Fischels, Defendant claimed that he had no reason to return to Rwanda because his Rwandan relatives are deceased and travel to Rwanda is expensive. *See* Gov't Ex. 100 (docket no. 208-6) at 3. While such response does not affirmatively evince a concern for his safety, neither does it evince a lack of concern. However, at trial, Defendant did affirmatively state that he would only return to Rwanda if he knew that he would be safe in doing so. In view of Defendant's trial testimony, the court sustains Defendant's objection to the fact that Defendant expressed no concern for his safety if returned to Rwanda. The court will not rely on this fact in determining Defendant's sentence.

In sum, the court shall overrule Defendant's objections to the following facts from the Final PSIR: (1) Defendant is a Hutu; (2) two of Defendant's half-brothers were in the Rwandan military; (3) Defendant's half-brother, Rwabidadi, guarded Defendant's home

and family after the Rwandan genocide began; (4) Defendant was a member and leader of MDR-POWER; and (5) Defendant actively participated in the Rwandan genocide. The court shall sustain Defendant's objections to the following facts: (1) Ndemezo and Rwabidadi are Defendant's brothers (rather than half-brothers); and (2) Defendant expressed no concern for his safety if returned to Rwanda.

### B. Family-Related Facts

The Final PSIR includes facts that Defendant was not married to Mukakabanda while living in Rwanda, and that he was married to Nyramacumbi in Rwanda. The Final PSIR includes facts that Defendant and Mukakabanda falsely claimed that Mukakabanda's son, Amabre Kabanda, was instead her brother, and that Mukakabanda made false statements about this and other facts during an April 2014 interview. The Final PSIR further includes facts that Defendant concealed information about his claimed children's parentage until confronted with the truth during the instant criminal proceedings. Defendant objects to these facts.

The court finds that Defendant was previously married to Nyramacumbi. Defendant acknowledged both at trial and in an interview with Agent Hunter that he had a relationship with Nyramacumbi when he lived in Rwanda and that he produced a child with her, but he denies that he and Nyramacumbi were ever married.[3] However, numerous persons who knew Defendant in Rwanda told Agent Hunter that they knew him to be married to Nyramacumbi. Indeed, Rwabidadi—Defendant's brother—identified Nyramacumbi, and not Mukakabanda, as Defendant's wife when asked in 2011. *See* Gov't Ex. 36 at 7. Most convincingly to the court, Nyramacumbi herself told Agent Hunter that she and Defendant were married in a civil ceremony in 1980. The court finds Nyramacumbi's account of her

---

[3] At trial, Defendant testified that he understood the term "marriage" to include unions that produced a child. However, it was unclear whether he understood persons to become married by virtue of producing a child or whether he understood that persons who produce children are typically married.

marriage to Defendant to be credible because she has nothing to gain from making such statement. In fact, Nyramacumbi has maintained that she is married to Defendant even though doing so has rendered her legally responsible for large sums of money owed by Defendant due to his actions during the genocide. Gov't Ex. 92 (docket no. 207-5) at 18. Further still, the fact that Defendant and Mukakabanda have wired money to Nyramacumbi on multiple occasions since arriving in the United States, *see* Gov't Ex. 13 (docket no. 116-16), and the fact that two of Nyramacumbi's sons bear names from Defendant's family—Ngombwa and Rwabidadi, *see* Gov't Ex. 92 at 17, lend additional circumstantial support to the court's conclusion that Defendant and Nyramacumbi were indeed married. Accordingly, the court overrules Defendant's objection to the fact that he was married to Nyramacumbi.

However, the court lacks sufficient evidence to find that Defendant was not married to Mukakabanda while living in Rwanda. On the one hand, Nyramacumbi claimed that Defendant did not legally marry Mukakabanda. Instead, Nyramacumbi claims that Mukakabanda's family informally accepted Defendant as Mukakabanda's husband in exchange for his payment of a dowry. *See id.* at 19. Likewise, Mukakabanda's Rwandan government-issued identification card lists her as unmarried. *See* Gov't Ex. 12 (docket no. 116-15) (stating that Mukakabanda is single, according to a translation of the document by government witness Freddy Munana). On the other hand, Defendant testified at trial that, in Rwanda, persons are considered married if they are formally married at a local commune office or a church or, alternatively, if the families of both persons recognize the marriage. Defendant has also stated that persons who live together for four years as if they are married are considered to, in fact, be married. *See* Gov't Ex. 100 at 2. Defendant's testimony foregrounds the fact that the record includes no evidence as to what it means to be "married" in Rwandan culture. Indeed, Agent Hunter testified at trial that he had no experience relevant to the topic of Rwandan marriage. And the definition of "marriage"

appearing on the relevant resettlement forms includes "legal, traditional, common-law, or other 'unions' which produced children." Gov't Ex. 4 (docket no. 116-7) at 3. Given the uncertainty of the record on this point, as well as witness statements identifying Defendant and Mukakabanda as being married while living in Rwanda, the court does not find that Defendant and Mukakabanda were unmarried to each other in Rwanda. Accordingly, the court sustains Defendant's objection to the fact that he was not married to Mukakabanda while living in Rwanda. The court will not rely on this fact in determining Defendant's sentence.

The court finds that Defendant and Mukakabanda falsely identified Mukakabanda's son, Kabanda, as being Mukakabanda's brother. During the resettlement process, Defendant identified Kabanda as Mukakabanda's brother. *See* Gov't Ex. 1 (docket no. 116-4) at 2 (written as "Kabanda Emmable"); Gov't Ex. 4 at 4 (written as "Kabanda, Aimable"). At trial, Defendant testified that Kabanda was Mukakabanda's father's son—*i.e.* her brother. In an interview with DHS agents, Mukakabanda also stated the Kabanda was her brother. *See* Gov't Ex. 102 (docket no. 208-6) at 32. At the hearing on Defendant's Motion for New Trial, three of Defendant's actual and claimed family members testified in a conclusory manner that they knew Kabanda to be Mukakabanda's brother. However, Mukakabanda's Rwandan government-issued identification card reflects "Kabanda" as being her son. *See* Gov't Ex. 12 at 1 (listing "Kabanda" as one of two of Mukakabanda's sons, according to a translation of the document by government witness Freddy Munana). Defendant's son, Juvenary Hakizimana, testified at trial that Kabanda was his stepbrother—*i.e.* Mukakabanda's son. Based on the trial evidence, the jury found beyond a reasonable doubt that Mukakabanda had a child named Kabanda that she failed to report during the resettlement process. *See* Jury Verdicts at 4 (placing check marks next to "Mukakabanda failed on the form to report having a child named Kabanda" and "Mukakabanda failed to report in the interview having a child named Kabanda").

Additionally, at the hearing on the Motion for New Trial, trial counsel testified that his investigation revealed Kabanda to be Mukakabanda's son.[4] Consistent with the jury's findings, and based on the greater weight of the evidence, the court finds that Kabanda is Mukakabanda's son and that Defendant and Mukakabanda falsely claimed that he was Mukakabanda's brother. Accordingly, the court overrules Defendant's objection to the fact that he and Mukakabanda falsely identified Kabanda as being Mukakbanda's brother.

The court also finds that Defendant affirmatively concealed the parentage of certain persons that he claimed as his children during the resettlement process. During the resettlement process, Defendant consistently claimed the following children: (1) Faustine Ngayaberua (Banner), (2) Gilbert Mugarula (Grant), (3) Juvenary Hakizimana, (4) Josiane Uwera, (5) Louise Usanase, (6) Grevais Murwanashyaka and (7) Antoinette Uwangombwa. *See* Gov't Ex. 1 at 1; Gov't Ex. 4 at 1; Gov't Ex. 4 at 3. In an October 2014 interview with DHS agents, Defendant conceded that Hakizimana was his son with Nyramacumbi, and that he was not, therefore, Mukakabanda's son. *See* Gov't Ex. 103 (docket no. 208-6) at 36. Additionally, in approximately December of 2014, it became known to the government that Mugarula and Ngayaberua were not, in fact, Defendant or Mukakabanda's children. *See* Gov't New Trial Ex. 1 (docket no. 143-1). Defendant argues that his failure to provide accurate information about Hakizimana, Mugarula and Ngayaberua prior to those dates does not reflect that he concealed such information. Instead, Defendant argues that it merely indicates that he was never asked to provide the information before it was revealed. However, during the resettlement process, Defendant was indeed asked to provide accurate information regarding the parentage of his claimed children. Defendant was asked to provide a family tree naming "all children, oldest to

---

[4] Trial counsel testified at the hearing on the Motion for New Trial because Defendant raised claims of ineffective assistance of counsel. *See generally* Motion for New Trial.

youngest, with same father & mother." Gov't Ex. 4 at 3. The humanitarian official that interviewed Defendant on this topic testified that she asked Defendant to identify all of his children with Mukakabanda—which are reflected on the form—and then asked him to identify any children from any other women—none of which were reported by Defendant. Given the parameters of the questions posed during the resettlement process, by providing false information, Defendant affirmatively concealed the true parentage of Hakizimana, Mugarula and Ngayaberua by claiming all of the listed children as being his children with Mukakabanda. Accordingly, the court overrules Defendant's objections to the facts that he concealed certain parentage information until late-2014.

The court also finds that Mukakabanda provided false statements to DHS agents during an April 2014 interview. During the interview, Mukakabanda was asked about persons in Rwanda to whom Mukakabanda had wired money from the United States. When asked about Nyramacumbi, Mukakabanda stated that Nyramacumbi was her aunt. When asked about Kabanda, Mukakabanda stated that Kabanda was her brother. Mukakabanda further stated that she had eight children and stated that Defendant had brothers in Rwanda, but that none had ever been in the military. As the court discussed above, Nyramacumbi is not Mukakabanda's aunt but is, instead, Defendant's wife from before he met Mukakabanda. Kabanda is not Mukakabanda's brother but is, instead, her son. Three of Mukakabanda's claimed children—Hakizimana, Mugarula and Ngayaberua—are not, in fact, Mukakabanda's children. And lastly, Defendant did, in fact, have half-brothers that were in the military. Therefore, Mukakabanda made false statements on these matters during the April 2014 interview. Accordingly, the court overrules Defendant's objection to the fact that Mukakabanda made false statements to investigators.

In sum, the court shall overrule Defendant's objections to the following facts from the Final PSIR: (1) Defendant was previously married to Nyramacumbi; (2) Defendant and

Mukakabanda falsely claimed that Kabanda was Mukakabanda's brother; (3) Defendant concealed information about Hakizimana's parentage; (4) Defendant concealed information about Mugarula and Ngayaberua's parentage; and (5) Mukakabanda made false statements in an April 2014 interview; . The court shall sustain Defendant's objection to the fact that Defendant was not married to Mukakabanda when they lived in Rwanda.

## C. Trial-Related Facts

The Final PSIR includes facts that Defendant made intentional false statements during the resettlement process, including a false claim that Twagiramungu was his brother, and that Defendant's eligibility for resettlement was based primarily on his purported relationship to Twagiramungu. The Final PSIR further includes facts that Defendant showed a proficiency in the English language at the time of a June 2014 interview with DHS agents, that he committed perjury when testifying at trial and that Defendant agreed with trial counsel that it was not in Defendant's best interest to call family members to testify in his defense. Defendant objects to these facts.

The court finds that Defendant made intentional false statements during the resettlement process, that he falsely claimed that he was Twagiramungu's brother and that his false statement about Twagiramungu was the primary basis for determining his eligibility for resettlement. These issues comprised the core of Defendant's jury trial, which concluded with the jury finding Defendant guilty of all counts—each of which required the jury to find beyond a reasonable doubt that Defendant intentionally made false statements or conspired to do so. *See* Jury Verdicts; *see also* Final Jury Instructions (docket no. 118) at 13-20. Therefore, Defendant's guilty verdicts establish that Defendant intentionally made false statements. During the trial, the government put forth significant evidence showing that Defendant claimed to be Twagiramungu's brother. On every document memorializing Defendant's resettlement interviews, Defendant claimed Twagiramungu was his brother. *See* Gov't Ex. 1 at 2; Gov't Ex. 2 (docket no. 116-5);

Gov't Ex. 3 (docket no. 116-6) (referring to a brother that "had a high govt post"); Gov't Ex. 4 at 3; Gov't Ex. 5 (docket no. 116-8) at 1; Gov't Ex. 6 (docket no. 116-9) at 3 (referring to a brother that was involved in politics and "helped form party" and that the brother was "moderate in seeking peace w/ rebels").  Defendant later denied that Twagiramungu was his brother.  His defense at trial centered on the theory that Defendant misunderstood the questions asked during the resettlement process, and that he intended to state that Twagiramungu was his "political brother" insofar as Defendant supported Twagiramungu's politics.  However, this theory was soundly refuted by the testimony of Martin, the INS officer that conducted Defendant's resettlement interview.  Martin described various detailed questions that he asked Defendant about Twagiramungu, following up on Defendant's statements about their relationship.  If it were true that Defendant was mistaken in his initial responses, the court finds that Martin's follow-up questions would have revealed such confusion and would have allowed Defendant an opportunity to clarify if he so intended.  Instead, Defendant intentionally maintained the falsehoods.  Additionally, the jury found beyond a reasonable doubt that certain of Defendant's claimed children falsely stated that Twagiramungu was their uncle—suggesting that Defendant's professed relationship to Twagiramungu was not merely a product of confusion.  *See* Jury Verdicts at 5 (placing check marks next to statements that Ngayaberua, Mugarula and Hakizimana all claimed that their uncle was "the prime minister of Rwanda").  Therefore, the evidence at trial establishes that Defendant falsely claimed that Twagiramungu was his brother.  Martin further testified that Defendant's claim that he was Twagiramungu's brother was the primary reason for his determination that Defendant had a well-founded fear of persecution if returned to Rwanda.  Martin stated that Defendant's fear of persecution would be far less well-founded if Defendant had stated that he was a mere political supporter—and not a biological brother—of Twagiramungu.  Because Martin held a central role in approving Defendant for

resettlement, the court credits his testimony over Defendant's unsupported alternative theory that he was approved for resettlement based principally on his mixed marriage and his Tutsi mother. Therefore, Martin's testimony establishes that Defendant's false claim about Twagiramungu was the principal reason for his resettlement to the United States. For all of these reasons, the court overrules Defendant's objections to the facts that he intentionally made false statements, including false statements about Twagiramungu, which served as the primary basis for his resettlement to the United States.

The court also finds that Defendant demonstrated a proficiency in the English language when interviewed by DHS agents in June of 2014. During the interview with Agents Hunter and Fischels, a Kinyarwanda-language interpreter named Freddy Munana was available to translate the agents' questions and/or Defendant's responses. *See* Gov't Ex. 100 at 1. However, at trial, Hunter, Fischels and Munana each testified that Defendant communicated in English during the interview, without requiring Munana's assistance, and that he exhibited no difficulty understanding or responding to the interview questions. The summary report of the June 2014 interview likewise includes no indication that Defendant had issues understanding or communicating in English with Hunter and Fischels. *See generally id.* Based on this evidence, the court overrules Defendant's objection to the fact that he demonstrated English-language proficiency during the June 2014 interview.[5]

---

[5] Defendant argues that there is conflicting evidence as to the extent of Defendant's proficiency in English and that, in any event, Defendant's English proficiency in 2014 does not establish English proficiency during the resettlement process. At trial, there was evidence that Defendant required interpretation services when communicating with trial counsel. Based on this evidence, the court accepts that Defendant's English proficiency may not extend to complex trial-related matters, and further notes that the use of Kinyarwanda-language interpreters during all court proceedings have insured against any gaps in Defendant's English proficiency. However, the court finds that Defendant's English proficiency does extend to less-complex matters, as exhibited by his effective

(continued…)

The court also finds that Defendant committed perjury at trial. Defendant took the oath and testified in his own defense at trial. Defendant denied that he was a member of MDR or MDR-POWER, denied that he claimed to be Twagiramungu's brother, denied that he was married to Nyramacumbi and denied providing false statements regarding several other matters during the resettlement process, among other testimony. Defendant's testimony on these matters was false, as the discussion above demonstrates. Further, the court finds that Defendant provided these false statements with knowledge that they were false, and intending to dispute that he provided false information during the resettlement process. Because Defendant's false testimony attempted to undermine the central allegations against him, the court finds that his false testimony was material. Therefore, Defendant's false testimony amounts to perjury. *See* Model Crim. Jury Instr. 8th Cir. § 6.18.1621 (2014) (stating the elements of perjury). Accordingly, the court overrules Defendant's objection to the fact that he committed perjury at trial.

The court lastly finds that Defendant agreed with trial counsel that it was in his best interest not to call family members to testify in his defense. In response to the allegations of ineffective assistance of counsel raised in the Motion for New Trial, trial counsel submitted an affidavit. *See generally* Trial Counsel Affidavit (docket no. 136). In the affidavit, trial counsel stated that he made a strategic decision not to call members of Defendant's family to testify at trial because he understood them to possess knowledge of additional false statements made by Defendant during the resettlement process. *See id.* at 2. Trial counsel further states that Defendant agreed with this strategy. *Id.* At the hearing

---

[5](…continued)

communication during the June 2014 interview. The court also accepts that Defendant's English proficiency in 2014 does not indicate that he had any degree of English proficiency during the resettlement process. However, the court rejects any implication that the interpreters used in the resettlement process were ineffective or that Defendant failed to comprehend the questions asked in his resettlement interviews. Such theory was advanced by trial counsel at trial and was soundly rejected by the jury's guilty verdicts.

on the Motion for New Trial, trial counsel's testimony was consistent with these statements. Defendant argues that it would have been in his best interest to have his family members testify and claims that he never indicated to the contrary. However, the court finds the statements made by trial counsel to be credible, particularly in view of his strategically sound concerns with introducing such testimony. Correspondingly, due to the sheer number of false statements made by Defendant during the instant proceedings, the court does not find his claim that he never agreed with trial counsel's strategy to be credible. Accordingly, the court overrules Defendant's objection to the fact that he agreed it was in his best interest not to call family members to testify in his defense.

In sum, the court shall overrule Defendant's objections to the following facts from the Final PSIR: (1) Defendant made intentional false statements during the resettlement process; (2) Defendant claimed to be the brother of Twagiramungu; (3) Defendant's eligibility for resettlement was based primarily on his claim that he was Twagiramungu's brother; (4) Defendant was proficient in his understanding of English during a June 2014 interview; (5) Defendant committed perjury when testifying at trial; and (6) Defendant agreed with trial counsel that it was in his best interest not to have family members testify in his defense.

## VII. OVERVIEW OF GUIDELINES ISSUES

The parties dispute the following issues regarding application of the United States Sentencing Guidelines ("USSG" or "Guidelines"): (1) an increase to Defendant's offense level reflecting his commission of the offense to conceal involvement in a serious human rights offense, pursuant to USSG § 2L2.2(b)(4)(B)(ii); (2) assessment of a four-level upward adjustment for aggravating role in the offense, pursuant to USSG § 3B1.1(b); (3) assessment of a two-level upward adjustment for obstruction of justice, pursuant to USSG § 3C1.1; (4) assessment of an upward departure for under-representation of criminal history, pursuant to USSG § 4A1.3(a)(1); and (5) assessment of certain upward departures

for aggravating factors of the offense, pursuant to USSG § 5K2. The government bears the burden of proof on the disputed Guidelines issues. *See United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004).

## VIII. BASE OFFENSE LEVEL & SPECIFIC OFFENSE CHARACTERISTICS

In the Final PSIR, the USPO calculates a base offense level of **8**, pursuant to USSG § 2L2.2. *See* Final PSIR ¶ 48. The parties do not dispute the base offense level. The USPO increases Defendant's offense level to **25** for commission of the offense to conceal Defendant's participation in a serious human rights offense, pursuant to USSG § 2L2.2(b)(4)(B)(ii). *See id.* ¶ 49. Defendant objects to the increased offense level on two grounds. First, Defendant argues that he did not participate in the Rwandan genocide, such that he did not commit the offense to conceal participation in a serious human rights offense. *See* Defense Brief at 10. Second, Defendant argues that the Ex Post Facto Clause of the United States Constitution bars application of the offense-level increase because Defendant's convictions on Counts 2 and 3 embrace conduct ending in 2004 and 2006, respectively, and the offense-level increase did not appear in the Guidelines until 2012. *See id.* at 11. The government argues that Defendant did, in fact, commit the offenses to conceal his participation in genocide. *See* Gov't Brief at 52-58. The government further argues that the offense-level increase applies to Defendant because Counts 2 and 3 are grouped with Count 4, which embraces conduct occurring in 2014—at which time the offense-level increase already appeared in the Guidelines. *See id.* at 11-12 (citing *United States v. Anderson*, 570 F.3d 1025, 1033 (8th Cir. 2009)).

The court shall first address the Ex Post Facto issue before addressing whether the offense-level increase is appropriate under USSG § 2L2.2(b)(4)(B)(ii).

### A. Ex Post Facto Clause

The Ex Post Facto Clause of the United States Constitution "prohibits both federal and state governments from enacting any '*ex post facto* Law.'" *Peugh*, 133 S. Ct. at 2081

30

(quoting U.S. Const. Art. 1, § 9, cl. 3; Art. 1, § 10). The Clause forbids application of a law "that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id.* (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798)). "The Clause ensures that individuals have a fair warning of applicable laws and guards against vindictive legislative action." *Id.* at 2085 (citing *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981)). Despite the advisory nature of the Guidelines, "[a] retrospective increase in the Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation." *Id.* at 2084.

"The sentencing guidelines direct courts to apply the guidelines manual in effect on the date of sentencing unless doing so would violate the Ex Post Facto Clause, in which case the guidelines manual in effect on the date that the offense of conviction was committed should be used." *Anderson*, 570 F.3d at 1033 (citing USSG § 1B1.11(a), (b)(1)). "However, the so-called 'one-book rule requires that the Guidelines Manual in effect on a particular date be applied in its entirety.'" *Id.* (internal quotation marks omitted) (quoting *United States v. Carter*, 490 F.3d 641, 643-44 (8th Cir. 2007)).

Applying the one-book rule to properly grouped offenses does not violate the Ex Post Facto Clause, even where certain of the grouped offenses would not individually be subject to the higher sentencing range resulting from application of the rule. *Id.*; *see also United States v. Cooper*, 63 F.3d 761, 762 (8th Cir. 1995) (holding that a defendant convicted of three grouped offenses occurring in August of 1991, September of 1991 and January of 1992 is subject to the higher sentencing range appearing in the Guidelines as amended in November of 1991). Courts examining the issue subsequent to the Supreme Court's opinion in *Peugh* have continued to hold "that the one book rule does not violate the Ex Post Facto Clause as applied to a series of grouped offenses." *United States v. Pagan-Ferrer*, 736 F.3d 573, 598 (1st Cir. 2013); *see also United States v. Shakbazyan*, 841 F.3d 286, 291 (5th Cir. 2016) ("Peugh had no notice of Guidelines enhancements that

31

would be promulgated a decade after he committed his crimes, but Shakbazyan was on notice of the Guidelines' one-book and grouping rules that would apply one version of the Guidelines to his pre- and post-amendment criminal conduct."); *United States v. Fletcher*, 763 F.3d 711, 717 (7th Cir. 2014) ("[T]he application of the newer, harsher version of the guidelines to grouped offenses that straddle an amendment poses no *ex post facto* problem because the grouping guidelines together with the one book rule provide adequate notice to defendants that they will face the harsher version of the guidelines if they choose to continue a course of conduct after the guidelines are amended.").[6]

The last date implicated in Count 2 is November 19, 2004. Indictment at 27; *see also* USSG § 1B1.11, comment. (n.2) ("[T]he last date of the offense of conviction is the controlling date . . . ."). The last date implicated in Count 3 is June 20, 2006. Indictment at 29. The last date implicated in Count 4 is October 15, 2014. Indictment at 33. In the Final PSIR, the USPO grouped the three offenses and relied on the 2015 Guidelines Manual, which was the manual in effect at the time of sentencing. Final PSIR ¶¶ 47, 47A. Because § 2L2.2(b)(4) was amended in 2012 to provide for the offense-level increase presently at issue, the Ex Post Facto Clause permits application of the offense-level increase only if Counts 2, 3 and 4 are properly grouped.

"All counts involving substantially the same harm shall be grouped together." *United States v. Espinosa*, 539 F.3d 926, 929 (8th Cir. 2008) (alterations omitted) (quoting

---

[6] Defendant argues that the court should adhere to dicta in the Seventh Circuit's opinion in *United States v. McMillian*, 777 F.3d 444, 448-49 (7th Cir. 2015) (Posner, J.). *See* Defense Brief at 13. In *McMillian*, the Seventh Circuit observes that permitting grouped offenses "to circumvent the ex post facto clause" stretches "the proposition that ignorance of the law is no defense to a preposterous extreme." *McMillian*, 777 F.3d at 449. However, in *McMillian*, the Seventh Circuit cites to the binding circuit precedent of *Fletcher* and observes that revisiting the law of that case "is an issue for another day." *Id.* As such, the court does not find *McMillian* to be persuasive authority for abandoning the view that application of the one-book rule to grouped offenses complies with the Ex Post Facto Clause.

USSG § 3D1.2). "[C]ounts should be grouped together when they 'involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.'" *United States v. Dvorak*, 617 F.3d 1017, 1028 (8th Cir. 2010) (quoting USSG § 3D1.2(b)). With respect to immigration offenses,

> the "victim" for purposes of [grouping offenses] is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. Where one count, for example, involves unlawfully entering the United States and the other involves possession of fraudulent evidence of citizenship, the counts are grouped together because the societal interests harmed (the interests protected by laws governing immigration) are closely related.

USSG § 3D1.2, comment. (n.2).

The court finds that Defendant's offenses are properly grouped under USSG § 3D1.2(b). First, Defendant's offenses involve closely related societal harms/victims. In Count 4, Defendant was convicted of making a materially false statement in violation of 18 U.S.C. § 1001(a)(2). Specifically, on October 15, 2014, Defendant falsely claimed to DHS Immigration and Customs Enforcement agents that he had never claimed to be Twagiramungu's brother. The "victim," or societal interest, harmed by making materially false statements is the government department or agency whose purpose is frustrated by the false statement. *See, e.g.*, *United States v. Ranum*, 96 F.3d 1020, 1027 (7th Cir. 1996) (citing *United States v. Gilliland*, 312 U.S. 86, 93 (1941)); *United States v. Shaw*, 44 F.3d 285, 289 (5th Cir. 1995) (citing *Gilliland*, 312 U.S. at 93); *United States v. Popow*, 821 F.2d 483, 486 (8th Cir. 1987) (citing *Gilliland*, 312 U.S. at 93); *United States v. Tobon-Builes*, 706 F.2d 1092, 1096 (11th Cir. 1983) (citing *Gilliland*, 312 U.S. at 93). Therefore, the victim of Defendant's offense in Count 4 is DHS—the department to whom Defendant made false statements—and the societal harm is the frustration of DHS's ability to enforce immigration laws and investigate immigration violations. In Counts 2 and 3, Defendant was convicted of procuring citizenship to which he was not entitled, in violation

of 18 U.S.C. § 1425(b), and conspiring to unlawfully procure citizenship, in violation of 18 U.S.C. §§ 371 & 1425(a). The procurement of citizenship is within the realm of DHS. *See* Department of Homeland Security, "Become a Citizen," DHS.gov, https://www.dhs.gov/how-do-i/become-citizen (last visited Feb. 1, 2017). Therefore, the victim of Defendant's offenses in Counts 2 and 3 is also DHS—the department from whom Defendant unlawfully procured and conspired to procure citizenship—and the societal harm is also the frustration of DHS's ability to enforce immigration laws and investigate immigration violations.

Additionally, the offenses in Counts 2, 3 and 4 are connected by a common criminal objective. During the resettlement process, Defendant made repeated false claims that Twagiramungu was his brother, among other false statements. According to the INS officer assigned to Defendant's application, Defendant's false statements regarding Twagiramungu were the primary basis for approving his resettlement. After resettling in the United States, Defendant earned permanent resident status and, ultimately, naturalization by affirming that he made no false statements to secure his presence in the United States—*i.e.* by concealing the false statements that he had previously made. In October of 2014, when confronted about his false claim that Twagiramungu was his brother, Defendant attempted to further conceal the truth by denying to DHS agents that he had ever made such false statements. Defendant's false statements in 2014 did not occur in a vacuum. The false statements in 2014 trace back to the false statements on his naturalization application, which trace back to the false statements on his permanent resident application, which trace back to his resettlement interviews. Viewed in this necessary context, it is clear to the court that Defendant's offense in Count 4 was connected to Counts 2 and 3 by a common criminal objective—namely, to procure (and avoid forfeiting) the United States citizenship to which he was not entitled.

Because Counts 2, 3 and 4 "involve the same victim and two or more acts or transactions connected by a common criminal objective," the court finds that the three counts of conviction are properly grouped under USSG § 3D1.2(b). Because Count 4 involves conduct occurring in October of 2014—after the Guidelines were amended to include the offense-level increase at USSG § 2L2.2(b)(4)(B)(ii)—the court finds it appropriate to use the 2015 Guidelines Manual, which was the manual in effect at the time of the Hearing. Because the offenses are properly grouped and subject to the one-book rule, application of the offense-level increase at USSG § 2L2.2(b)(4)(B)(ii) does not violate the Ex Post Facto Clause. Accordingly, the court shall proceed to consider whether application of the offense-level increase is appropriate in the instant case.

### B. Concealment of Serious Human Rights Offense

USSG § 2L2.2(b)(4)(B)(ii) provides: "If the defendant committed any part of the instant offense to conceal the defendant's participation in . . . any other serious human rights offense [besides incitement of genocide], increase by **10** levels. If . . . the resulting offense level is less than level **25**, increase to level **25**."

> "Serious human rights offense" means (A) violations of federal criminal laws relating to genocide, torture, war crimes, and the use or recruitment of child soldiers under sections 1091, 2340, 2340A, 2441, and 2442 of title 18, United States Code . . . ; and (B) conduct that would have been a violation of any such law if the offense had occurred within the jurisdiction of the United States or if the defendant or the victim had been a national of the United States.

USSG § 2L2.2, comment. (n.4). Relevant to the facts established at the Hearing, federal law defines the offense of genocide as follows:

> Whoever, whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—(1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment

of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group; shall be punished as provided in [this section].

18 U.S.C. § 1091(a) (formatting omitted). The government argues that Defendant's activities during the Rwandan genocide would have been a violation of § 1091 if they had occurred within the jurisdiction of the United States or been directed toward a national of the United States. *See* Gov't Brief at 52-58. The government further argues that Defendant's offenses—wherein he made false statements in support of his resettlement and, ultimately, naturalization in the United States—were committed in part to conceal his participation in genocide. *Id.* at 58. Defendant argues that he "did not participate in the Rwanda genocide of Tutsis" and that "[h]e did not injure, kill, or assist others in the genocide." Defense Brief at 10.

As discussed above, the court finds by a preponderance of the evidence that Defendant actively participated in the Rwandan genocide. Credible eyewitnesses state that, during the genocide, Defendant personally killed Tutsis and led the Interahamwe on missions to kill Tutsis. Evidence further established that the purpose of the Rwandan genocide was to systematically kill Tutsis in order to maintain the preeminence of the Hutu majority within the country and government of Rwanda. Eyewitnesses state that Defendant participated in his acts of violence toward Tutsis while espousing anti-Tutsi views consistent with the purpose of the genocide and, indeed, evidence introduced at the Hearing established that Defendant was a local leader of the extremist anti-Tutsi political party MDR-POWER. Accordingly, the court finds that Defendant killed Tutsis "with the specific intent to destroy, in whole or in substantial part," the Tutsi presence in Rwanda and, therefore, engaged in acts of genocide as defined at 18 U.S.C. § 1091(a).

36

Defendant's offenses of conviction involved the making of false statements to conceal his role in the genocide.  Because the United States does not admit aliens that participated in genocide, *see* 8 U.S.C. § 1182(a)(3)(E)(ii), Defendant's concealment of his participation in the genocide was necessary for his naturalization as a United States citizen. Defendant made false statements that provided the basis for his resettlement and proceeded to make false statements to secure permanent resident status and naturalization.  Indeed, in his application for permanent resident status, Defendant falsely denied that he was "engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of . . . ethnic origin." Gov't Ex. 9 at 4.  In light of this context, wherein Defendant made false statements to procure naturalization to which he was not entitled because of his involvement in the Rwandan genocide, the court finds that he committed his offenses to conceal his participation in a serious human rights offense—namely, genocide.

Accordingly, Defendant's offense level shall be increased to **25**, pursuant to USSG § 2L2.2(b)(4)(B)(ii).

## XI.  ADJUSTMENTS

In the Final PSIR, the USPO applies a **4**-level upward adjustment for role in the offense, pursuant to USSG § 3B1.1(a), and a **2**-level upward adjustment for obstruction of justice, pursuant to USSG § 3C1.1.  *See* Final PSIR ¶¶ 51-52.  Defendant objects to both adjustments.  *See* Defense Brief at 16.  The court shall address each adjustment in turn.

### A. Role in the Offense

USSG § 3B1.1(a) provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels." "[I]n order for a defendant to be an organizer or leader, there must be some evidence that he directed at least one other participant." *United States v. Musa*, 830 F.3d 786, 788 (8th Cir. 2016). "A 'participant' is a person who is criminally responsible for the commission of the offense but need not have been convicted." USSG § 3B1.1, comment. (n.1). "The person being sentenced is counted as a participant in determining the total number of participants." *United States v. Matlock*, 109 F.3d 1313, 1317 (8th Cir. 1997). A criminal activity may be "otherwise extensive," despite involving fewer than five participants if it encompassed "unknowing services of many outsiders." USSG § 3B1.1, comment. (n.3). In determining whether a defendant is an organizer or leader of a criminal activity, the court looks to the entirety of the defendant's relevant conduct, not merely the elements and acts comprising the counts of conviction. *See* USSG Ch. 3, Pt.B, intro. comment. Factors relevant to a defendant's status as organizer or leader include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG ¶ 3B1.1, comment. (n.4). The "adjustment does not apply to a defendant who merely suggests committing the offense." *Id*.

The government argues that the four-level upward adjustment applies to Defendant because he "solicited" Bizumwami to attest that he was Defendant's relative and because he demanded that Mukakabanda, Ngayaberua, Mugarula and Hakizimana corroborate his

38

false statements.  *See* Gov't Brief at 61.  It is true that Bizumwami, Mukakabanda, Ngayaberua, Mugarula and Hakizimana provided false statements during the resettlement process that corroborated Defendant's own false statements.  *See* Jury Verdicts at 4-5. However, there is no evidence on record that Defendant "solicited" or demanded them to corroborate his statements.  At trial, Bizumwami did not testify that Defendant "solicited" him to claim Defendant as a relative.  Instead, Bizumwami testified that he made the claim because, if both he and Defendant were believed to be relatives, Bizumwami would be more likely to be resettled in a location near Defendant, whom he considered a friend. Likewise, in an interview with DHS agents, Bizumwami gave no indication that Defendant solicited him to claim Defendant as a relative.  *See* Gov't Ex. 101 (docket no. 208-6) at 25-28.  Instead, Bizumwami (and his wife, who also participated in the interview) stated that they corroborated Defendant's false claims because they understood that Defendant wanted to be resettled in an area with other Rwandans and they did not want to cause "bad luck" to Defendant after having endured the genocide.  *Id.* at 27-28.  The government further fails to identify any evidence that Defendant demanded Mukakabanda, Ngayaberua, Mugarula or Hakizimana to corroborate his false statements.   The government merely draws such inference based on the bare fact that they, too, provided false statements.  In fact, Ngayaberua and Hakizimana testified at trial that nobody ever encouraged them to identify Twagiramungu as their uncle.  Given this record, there is insufficient evidence to find that Defendant recruited, directed or organized any particular persons to engage in criminal activity.  *See United States v. Richart*, 662 F.3d 1037, 1046 (8th Cir. 2011) (recognizing in dicta that a defendant who makes false statements and participates in a conspiracy to do so does not, without more, warrant application of an aggravating role adjustment).   Accordingly, the court finds that a four-level upward adjustment for aggravating role in the offense, pursuant to USSG § 3B1.1(a), is unwarranted.

### *B.  Obstruction of Justice*

USSG § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

"A defendant who commits perjury is subject to an obstruction enhancement under USSG § 3C1.1." *United States v. Titlbach*, 300 F.3d 919, 924 (8th Cir. 2002).  As such, the two-level adjustment "applies when the district court finds by a preponderance of the evidence that a defendant willfully testified falsely under oath and the false testimony related to a material matter." *United States v. McDonald*, 826 F.3d 1066, 1071 (8th Cir. 2016).

 As discussed above, the court finds by a preponderance of the evidence that Defendant committed perjury when he testified at trial.  Particularly, Defendant took the oath and proceeded to deny that he was a member of MDR and MDR-POWER, denied that he claimed to be Twagiramungu's brother, denied that he was married to Nyramacumbi and denied making further false statements during the resettlement process.  This false testimony related to a material matter because it went to the central issue of Defendant's offenses of conviction—whether he made false statements to procure citizenship to which he was not entitled.  The court also finds that Defendant intended to testify falsely and did so with knowledge that his testimony was false.  Particularly, certain portions of Defendant's false testimony—regarding his membership in MDR and MDR-POWER, his claims regarding Twagiramungu and his marriage to Nyramacumbi—implicate major touchstones from his life in Rwanda.  As such, the court rejects any argument that he was unaware that his testimony on such matters was false.  Further, by convicting Defendant

on Count 4, the jury found that Defendant made a material false statement when he told DHS agent that he never claimed to be Twagiramungu's brother. By convicting Defendant on Count 4, the jury effectively determined that Defendant committed perjury by making the same false statement while testifying at trial. In any event, the court finds that the record establishes "all of the factual predicates for a finding of perjury," and finds that Defendant willfully obstructed justice with respect to his prosecution for the offenses of conviction. *United States v. Nshanian*, 821 F.3d 1013, 1018 (8th Cir. 2016) (quoting *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)). Accordingly, the court finds that a two-level upward adjustment for obstruction of justice, pursuant to USSG § 3C1.1, is warranted. Defendant's adjusted offense level is **27**.

## X. PRE-DEPARTURE GUIDELINES RANGE

Prior to the application of any departure or variance, Defendant is a Criminal History Category I, with a total adjusted offense level of **27**. As such, his advisory Guidelines range is **70-87 months imprisonment**.

## XI. DEPARTURES

After calculating the appropriate guideline range, the court proceeds to "decide if the guidelines permit a traditional departure." *United States v. Miller*, 479 F.3d 984, 986 (8th Cir. 2007). The government argues that the court should apply upward departures based on: (1) under-representation of criminal history, pursuant to USSG § 4A1.3(a); and (2) aggravating circumstances associated with Defendant's involvement in the Rwandan genocide, pursuant to various provisions of § 5K2. *See* Gov't Brief at 77-85.[7] The court shall address each departure in turn.

---

[7] The government urges additional upward departures in the event the court finds that the Ex Post Facto Clause bars application of the offense-level increase for commission of the offense to conceal participation in a serious human rights offense. *See* Gov't Brief at 74-76. However, because the court finds that the Ex Post Facto Clause does not apply to Defendant's grouped offenses, the court declines to address such additional departures.

## A. Under-Representation of Criminal History

USSG § 4A1.3(a)(1) provides for an upward departure "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history . . . ." "When contemplating and structuring such a departure, the district court should consider both the nature and extent of a defendant's criminal history." *United States v. Azure*, 536 F.3d 922, 930 (8th Cir. 2008) (quoting *United States v. Hacker*, 450 F.3d 808, 812 (8th Cir. 2006)). "To impose an upward departure under § 4A1.3, the sentencing court first must proceed along the criminal history axis of the sentencing matrix, comparing the defendant's criminal history with the criminal histories of other offenders in each higher category." *United States v. Brave Bull*, 828 F.3d 735, 740 (8th Cir. 2016) (alteration omitted) (quoting *Azure*, 536 F.3d at 931). While the court need not "discuss[] each criminal history category it rejects en route to the category that it selects," it must nevertheless "adequately explain why it determines that the intermediary categories fail to meet the purposes of § 4A1.3." *Id.* (quoting *United States v. Mees*, 640 F.3d 849, 854 (8th Cir. 2011)). Convictions in foreign jurisdictions may form the basis for an upward departure under USSG § 4A1.3. *See* USSG § 4A1.3(a)(2)(A).

The government argues that an upward departure is warranted because Defendant's criminal history does not reflect his gacaca convictions, the genocide-related conduct underlying such convictions or Defendant's pending state charges for arson and attempted insurance fraud. *See* Gov't Brief at 78-81. The court agrees, and finds that Criminal History Category I woefully under-represents the severe nature of Defendant's history of criminal conduct and finds that an upward departure is warranted.

As discussed above, the court finds by a preponderance of the evidence that Defendant participated in the Rwandan genocide. Defendant's actions during the genocide are completely unrepresented in his criminal history calculation. Nevertheless, the court

finds that the eyewitness reports of Defendant's acts of violence—bolstered by his convictions in two separate gacaca courts[8]—constitute "reliable information" indicating that Defendant's classification in Criminal History Category I under-represents the severity of his criminal history. *See United States v. Port*, 532 F.3d 753, 754-55 (8th Cir. 2008) (affirming district court's "consideration of foreign convictions as one possible basis for finding an understated criminal history and departing upward"). An upward departure is warranted on this basis.

The court also finds that the facts underlying Defendant's pending arson and attempted insurance fraud charges further contribute to Defendant's criminal history being under-represented. *See United States v. Porter*, 439 F.3d 845, 849 (8th Cir. 2006) (indicating that a sentencing court may consider the factual predicates for pending charges when assessing an upward departure under USSG § 4A1.3(a)). Evidence produced at the

---

[8] Defendant presented evidence at the Hearing, and argues at length in his briefing, that the gacaca courts are too unreliable to be considered by the court. *See* Defense Brief at 17-23. The court acknowledges that the gacaca proceedings lacked certain rights that are guaranteed in a domestic tribunal. However, at the Hearing, Dr. Phil Clark provided expert testimony about the operation of the gacaca courts. Dr. Clark testified as to the various procedural protections that were in place during gacaca proceedings and stated that the proceedings were procedurally fair to accused individuals, as evidenced by a healthy ratio of acquittals to convictions. Dr. Clark's perspective on these matters was informed by his experience observing numerous gacaca proceedings and interacting with the relevant actors involved. The court credits Dr. Clark's testimony because of his vast experience—both academic and in-person—with the gacaca system. Particularly, the court credits Dr. Clark's testimony over the testimony of defense witness Leopold Nsengiyumva, whose experience stemmed primarily from the International Criminal Tribunal for Rwanda and who had never personally observed or interacted with gacaca proceedings. As such, the court finds Defendant's gacaca convictions to be reliable for purposes of sentencing. Furthermore, the court recognizes that the gacaca courts found, after their investigations, that Defendant participated in genocide. This conclusion is consistent with the court's own finding by a preponderance of the evidence. Thus, the court finds Defendant's gacaca convictions to bolster the court's finding that Defendant participated in the Rwandan genocide and to further exemplify that Defendant's criminal history is under-represented.

Hearing establishes by a preponderance of the evidence that Defendant committed the crimes charged. *See* Gov't Exs. 65, 67 (docket no. 207-1). The evidence establishes that officers responded to a 911 call from Defendant's daughter, Uwangombwa, about a fire at Defendant's home. After the fire was extinguished, officers found "no accidental ignition sources" in the home, but did find a container of gasoline by the stairway and a box of matches on the kitchen counter. Officers learned that, shortly before the fire, Defendant had been involved in a verbal dispute with his wife. Uwangombwa informed officers that, after the dispute, Defendant would not allow her to enter the home. From outside the house, Uwangombwa saw Defendant walk through the home carrying a box of matches. Defendant left the house after a short period, warned Uwangombwa to stay outside the house because it was dangerous inside and then drove away. Shortly after Defendant left the house, Uwangombwa observed fire and smoke coming from the home and called 911. Defendant told officers that he was the only person inside the home at the time of the fire, but he denied starting the fire and speculated as to the source of the fire. Defendant submitted an insurance claim in which he identified no known cause for the fire and affirmed that it did not originate from his own doing. *See* Gov't Ex. 19 (docket no. 124). An "Origin and Cause Investigation" of the fire ultimately revealed that the fire was "set intentionally," based on evidence that the fire originated from two separate and unconnected areas of the home. Gov't Ex. 68 (docket no. 207-1) at 13. Based on this record, the court finds by a preponderance of the evidence that Defendant set fire to his home and submitted a fraudulent insurance claim. And because this criminal conduct is unscored for purposes of Defendant's criminal history, the court finds that Defendant's Criminal History Category I further under-represents the severity of his criminal history. An upward departure is warranted on this basis.

In determining the appropriate category in which to place Defendant, the court finds it useful to consider the criminal history points that would be assigned to a defendant with

convictions for the same conduct that Defendant engaged in. A conviction under the federal genocide statute where death to the victim results carries a punishment of "death or imprisonment for life." *See* 18 U.S.C. § 1091(b)(1). A conviction under Iowa's second-degree arson statute[9] carries a punishment of "no more than ten years" imprisonment. *See* Iowa Code § 712.3 (defining arson in the second degree as a class "C" felony); Iowa Code § 902.9(1)(d) (providing that a class "C" felony carries a punishment of "no more than ten years" confinement). A conviction under the relevant Iowa insurance fraud statute carries a punishment of "no more than five years" imprisonment. *See* Iowa Code § 507E.3(2)(a) (defining fraudulent submissions—presenting false information as a class "D" felony); Iowa Code § 902.9(1)(d) (providing that a class "D" felony carries a punishment of "no more than five years"). Based on the punishment provisions of the relevant criminal offenses, the court finds that Defendant should be assessed three criminal history points for each of the two gacaca convictions resulting from his actions during the genocide, *see Port*, 532 F.3d at 754-55, and two points total for the facts underlying his arson and attempted insurance fraud charges. This results in Defendant having a total of eight criminal history points, which places him in Criminal History Category IV. The court finds this score to sufficiently reflect the score Defendant would have received if he had been convicted in domestic courts for the conduct at issue. Placement in any lesser category would fail to reflect the severity of Defendant's criminal history. The court recognizes that the brutality of Defendant's conduct during the genocide might arguably warrant placement in an even higher criminal history category. However, the court finds that the offense-level increase pursuant to § 2L2.2(b)(4)(B)(ii) and the adjustment for obstruction of justice, in addition to placement in Criminal History Category IV,

---

[9] Defendant was charged with arson in the second-degree and "insurance fraud—presenting false information." *See State v. Ngombwa*, 06571 FECR 105028 (Iowa Dist. Ct. Linn Cty. 2013).

adequately account for Defendant's offense conduct. Accordingly, the court shall apply an upward departure to consider Defendant as a Criminal History Category IV, pursuant to USSG § 4A1.3(a)(1).[10]

## B. *Aggravating Circumstances*

USSG § 5K2 provides a series of grounds for upward departures. The government urges a variety of departures, pursuant to USSG §§ 5K2.0(a)(1)(A), 5K2.1, 5K2.2, 5K2.6, 5K2.7 and 5K2.8, based on the aggravating circumstances of Defendant's conduct during the genocide. *See* Gov't Brief at 82-85. USSG § 5K2.0(a)(1)(A) provides for an upward departure where "the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating . . . circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." USSG § 5K2.1 provides for an upward departure "[i]f death resulted" from the offense conduct. USSG § 5K2.2 provides for an upward departure "[i]f significant physical injury resulted" from the offense conduct. USSG § 5K2.6 provides for an upward departure "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense." USSG § 5K2.7 provides for an upward departure "[i]f the defendant's conduct resulted in a significant disruption of a governmental function." USSG § 5K2.8 provides for an upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." The decision to depart upward is committed to the court's discretion. *See United States v. Stoney End of Horn*, 829 F.3d 681, 688 (8th Cir. 2016) (reviewing upward departure for abuse of discretion).

---

[10] The government provides that "[i]f the [c]ourt elects not to depart upward, the government alternatively requests that the [c]ourt vary upward" pursuant to 18 U.S.C. § 3553(a). Gov't Brief at 85. Because the court shall depart upward pursuant to USSG § 4A1.3(a)(1), the court does not address the government's alternative request for a variance in this Sentencing Memorandum Both parties will have an opportunity to argue for a variance when the Hearing reconvenes on March 2, 2017.

The court recognizes that it has the ability to further depart upward based on some or all of the aggravating circumstances identified by the government. Defendant's acts during the genocide were brutally violent and warrant significant punishment. However, Defendant's naturalization has been revoked, *see* May 23, 2016 Order (docket no. 162), and he will likely be removed to Rwanda upon his release from imprisonment, at which time he will face further consequences for his role in the genocide, stemming from his two gacaca convictions and a pending prosecution by the Rwandan National Public Prosecution Authority. *See* Gov't Ex. 27 (docket no. 124-3) (three-count indictment against Defendant alleging genocide, extermination as a crime against humanity and murder as a crime against humanity). As such, any need for additional punishment is most appropriately addressed by the government of Rwanda. In view of this context, the court finds that the significant offense-level increase pursuant to § 2L2.2(b)(4)(B)(ii), the adjustment for obstruction of justice and the multi-level increase to Defendant's criminal history category combine to adequately account for Defendant's offense conduct. Accordingly, the court finds that the various departures requested by the government pursuant to § 5K2 are unwarranted.

## XII. CONCLUSION

Defendant's total adjusted offense level is **27**. After applying an upward departure pursuant to USSG § 4A1.3, Defendant is considered as a Criminal History Category IV. Accordingly, Defendant's final Guidelines range is **100-125 months imprisonment**. The court reserves ruling on the parties' requests for variances. The court will hear arguments from the parties regarding the appropriate sentence to be imposed when the Hearing convenes on March 2, 2017.

**IT IS SO ORDERED**.

**DATED** this 7th day of February, 2017.

_____

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA